No. 46,414

STATE OF KANSAS, *Appellee,* v. THOMAS P. LAMB, *Appellant.*

(497 P. 2d 275)

Opinion filed May 6, 1972.

*Eugene T. Hackler*, of Olathe, argued the cause and was on the brief for the appellant.

*Mark L. Bennett, Jr.*, Assistant County Attorney, argued the cause, and *Vern Miller*, Attorney General, and *James A. Wheeler*, County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in a criminal action wherein Thomas P. Lamb (defendant-appellant) was convicted of two offenses of kidnapping in the first degree with bodily harm having been inflicted (K. S. A. 21-449), and of murder in the first degree (K. S. A. 21-401). The trial court sentenced Lamb to life imprisonment on each count, and decreed the sentences to run consecutively.

The charges arose out of the abduction and murder of Karen Sue Kemmerly, and the abduction of Patricia Ann Childs.

Numerous points, including trial errors, are asserted by the appellant for reversal.

The chronology of events disclosed by the record may be stated as follows:

Karen Sue Kemmerly left her home in Kansas City, Missouri, at approximately 10:00 o'clock on the morning of December 2, 1969, to go shopping. She was attired in a gray plaid dress with a chain-

link belt. In her possession was a number of credit cards issued to her as well as a checkbook, billfold and a wrist watch in good condition. Miss Kemmerly's departure from home in her 1967 green Mustang was witnessed by her mother, Mrs. Dorothy Moberly. The Mustang contained an electronic garage door opener.

Later, on the morning of December 2, 1969, Dorothy Hamilton, a clerk in the Chasnoff Store in Ward Parkway Shopping Center, sold a purse to Miss Kemmerly. Erwin Sterm, an employee of the Caldwell Store in the shopping center, on the same morning sold a pair of shoes to Karen Sue Kemmerly. The shopping center is located on the east side of State Line Road in southern Kansas City, Missouri.

On December 3, 4 and 5 an officer of the Leawood, Kansas, police department, while on routine patrol, observed Miss Kemmerly's 1967 Mustang parked in the Ward Parkway Shopping Center. The officer examined the vehicle on at least one occasion and observed a woman's gray plaid dress with a chain-link belt, as well as other articles of women's clothing, folded and placed on the right front seat of the automobile. This vehicle and the clothing were later identified by Mrs. Moberly as belonging to her daughter. The clothing was the same clothing her daughter had been wearing when she left the family home the morning of December 2, 1969.

While quail hunting with two friends on December 7, 1969, Vernie Rome discovered the body of a nude female lying in a hedgerow. The body was found in a rural area of Johnson County, Kansas, approximately three miles south and east of Olathe, Kansas. Mr. Rome promptly telephoned the Johnson County sheriff's office to report the discovery. An on-the-scene investigation by the officers established the body was covered with snow and that neither any clothing of the victim nor any possible murder weapon could be found in the vicinity of the body.

Subsequent to its discovery the body was transported to the Amos Brothers Funeral Home in Shawnee, Kansas, where an autopsy was performed by Dr. James Bridgens, a pathologist with extensive experience in that field. Mrs. Dorothy Moberly identified the body as being that of her daughter, Karen Sue Kemmerly.

After positive identification of the body, the "Metro Squad" of the greater Kansas City area was activated and an intensive investigation ensued. During the course of the investigation, Miss Kemmerly's Mustang automobile was processed and a partial fingerprint

was taken from the right front seat support. Despite the intensive investigation conducted by the "Metro Squad," no charges were filed against anyone between December 7, 1969, the date the body was discovered, and January 16, 1970.

Patricia Ann Childs, an eighteen year old college coed, left her home in Overland Park, Kansas, on January 15, 1970, to go shopping at the Metcalf South Shopping Center. The Metcalf South Shopping Center is only a few miles distant from the Ward Parkway Shopping Center.

Miss Childs testified that after shopping approximately forty-five minutes, she proceeded to her car in the parking lot surrounding the shopping center and started to enter the driver's side of her vehicle when the appellant placed a gun in her side and pushed her into her automobile.

After asking for and receiving the vehicle's keys from Miss Childs, the appellant proceeded to drive around the parking lot for several minutes. He then stopped the car, parked it a few spaces distant from where it had originally been parked, and proceeded to wipe his fingerprints from the interior of the automobile with a handkerchief. Appellant then forced Miss Childs out of her vehicle and into his own automobile, a brown Plymouth. Prior to entering his own vehicle, the appellant also wiped his fingerprints from the exterior of Miss Childs' automobile.

The appellant tied Miss Childs' hands with a leather strap, drove out of the shopping center, and headed south on U. S. Highway No. 69.

The appellant drove past Olathe, Kansas, and Pleasanton, Kansas, and then made a short stop in Fort Scott, Kansas, during which he telephoned someone to tell them he would not be home that evening.

The appellant then drove his automobile into a rural area outside Fort Scott and pulled off the roadway. At this time the appellant first ordered Miss Childs to disrobe and get into the back seat of his car. Miss Childs testified appellant informed her she would not be hurt if she did as she was told. While Miss Childs was disrobing appellant picked up her purse and began rummaging through it, asking her if she had any credit cards belonging to either her or her father. Her reply was in the negative.

After disrobing, Miss Childs placed her clothing on the floorboard of the automobile. Appellant then picked up the articles of clothing and placed them on the right front seat of the vehicle. Miss Childs'

hands were then taped and appellant had sexual intercourse with her.

Thereafter appellant again commenced driving his vehicle, and as best Miss Childs could tell, they proceeded to Pittsburg, Kansas, where he directed her to make a telephone call to her parents. Upon placing the call, Miss Childs' younger sister answered the phone and started questioning her. At this time Patricia was forced to hang up the phone. Appellant and Miss Childs then drove around the Pittsburg, Kansas, area and at one point stopped and ate at a small restaurant outside of Pittsburg. During this stop Miss Childs testified she made no attempt to escape because she was afraid of the appellant.

Later that same evening, January 15, 1970, a second call was placed by Miss Childs to her home in Johnson County, Kansas. That call was answered by Miss Childs' mother. The appellant told Miss Childs to inform her mother that she had been kidnapped. The appellant himself then talked to Mrs. Childs and demanded $3,500 for the safe release of Patricia. Mrs. Childs informed the appellant he should call back when her husband was there, at which time this conversation was concluded.

Approximately thirty minutes later another call was placed to the Childs' residence. At this time the appellant spoke with Joseph Childs, Patricia's father, and advised Mr. Childs to obtain $3,500 in one hundred dollar bills. He informed Mr. Childs if he did as he was told, Miss Childs would not be harmed, and further that he, the appellant, would call Mr. Childs the following day to give him directions as to how the transfer of money would take place.

Thereafter, the appellant drove around the Pittsburg and Fort Scott areas for some time and then proceeded to a rural area, where, in a field several hundred feet off of a country road, Miss Childs was forced to remove her clothing a second time. The appellant again placed the clothing on the right front seat of the automobile after which he forced Miss Childs to submit to an act of sexual intercourse. Appellant and Miss Childs spent the night in the automobile parked at this location. The next morning they proceeded north toward Olathe, Kansas.

After arriving in Olathe the appellant drove his automobile around the area for some time, and then made a telephone call to the Childs' residence from a drive-up phone on the south edge of town. At this time the appellant directed Mr. Childs to bring the

$3,500 in one hundred dollar bills to the parking lot of the bowling alley in Olathe, where the exchange would be made. While awaiting Mr. Childs' arrival, the appellant continued to drive around the Olathe area, and at one point stated to Miss Childs, according to her testimony, "I hope your dad does not bring the police, because I don't want to get caught. I can get hung for this because I kidnapped you and I raped you."

A short time later, Mr. Childs arrived in Olathe, met with the appellant and Patricia in the parking lot of the bowling alley and paid the ransom, at which time Patricia Childs was released by the appellant to her father. At this point, as the appellant commenced to drive away from the area, officers of the Overland Park police department and the Johnson County sheriff's office, who had staked out the area where the exchange was to take place, attempted to apprehend the appellant. A high speed automobile chase commenced which ended a short time later when the appellant crashed his vehicle into a police blockade at a speed of approximately eighty miles per hour. Following the crash, there was recovered from the appellant's wrecked vehicle a leather thong, tape, a .22 caliber blank pistol, a knife and sheath and $3,500 in one hundred dollars bills.

Although appellant was thrown from his vehicle at the time of the collision, he was not injured seriously. Appellant was first taken to a local area hospital where he received medical treatment for his injuries and later transferred to the Johnson County jail where he was booked and fingerprinted.

Following the appellant's apprehension on January 16, 1970, the state made application to the Honorable Earle Jones, judge of the Johnson County magistrate court, division No. 2, for issuance of a search warrant for the premises of the Thomas Lamb residence in Fort Scott, requesting permission to search for certain articles belonging to Karen Sue Kemmerly.

The court issued the search warrant after hearing sworn testimony from witnesses, at least two of whom were officers of the law.

This warrant was then executed by officers of the Johnson County sheriff's office, Bourbon County sheriff's office, Fort Scott police department and the Kansas highway patrol on the 16th day of January, 1970. During the execution of this warrant, the shoes and purse purchased by Miss Kemmerly on the 2nd day of December, 1969, from Chasnoff's and Caldwell's in the Ward Parkway Shopping

Center were located in the garage of the Lamb residence. Eight credit cards issued to Karen Kemmerly, as well as her wrist watch, in a damaged condition, and her checkbook covers were found in the Lamb home.

Subsequent to the issuance of the first search warrant on January 16, 1970, the known fingerprints of Thomas Lamb, taken from him at the time of his arrest, were transported to the Kansas City, Missouri, police department where a fingerprint identification technician compared them with the print lifted from Karen Sue Kemmerly's car on December 7, 1969. In the opinion of the technician, the fingerprint lifted off Miss Kemmerly's automobile was identical to the known fingerprint of the appellant.

On January 28, 1970, it was brought to the attention of the officers investigating the case by Mrs. Moberly that Karen's electronic garage door opener was also missing from her automobile. At this point a second application was made requesting a search warrant for the residence of the appellant, and again sworn testimony was presented to the court in support of the application, following which the warrant was issued. The second search warrant was served by officers of both Johnson and Bourbon Counties on January 28, 1970. Recovered from the dresser of the appellant was the missing electronic garage door opener, which later tests revealed would open the garage door of Karen Sue Kemmerly's home.

Subsequent to appellant's arrest on January 16, 1970, he was charged with two counts of first degree kidnapping and one count of first degree murder. He was ordered held in the Johnson County jail at Olathe without bond. On January 21, 1970, while being held in the Johnson County jail, and with the help of a jail trustee, Pat McKey, the appellant obtained a .38 caliber pistol. He and the trustee then took three dispatchers and a jailer captive and escaped from the jail after locking the four sheriff's officers in a jail cell. The appellant and McKey then proceeded across the street from the courthouse to a small cafe where they took a patron, Loyd Midyett, hostage. The pair then commandeered Midyett's car and, with Midyett in their custody, sped south from Olathe, making good their escape from the Johnson County jail. The subjects were later spotted in the area of LaCygne, Kansas, where they were eventually apprehended at a roadblock without Midyett having suffered any physical harm. According to Midyett's testi-

mony, at one point during this trip from Olathe to LaCygne, Lamb told McKey to look out the window to see if they were being followed, and at the same time, said that if they caught him now he would be hanged for sure, following which the hostage, Midyett, said, "you haven't done anything yet to be hanged for," and the appellant answered, "Mister, I am a murderer."

After the appellant's recapture, a preliminary hearing was held in the magistrate court of Johnson County, Kansas, and the appellant was bound over to the district court of Johnson County, Kansas, on two counts of first degree kidnapping and one count of first degree murder. Subsequently, several pretrial motions were filed by the appellant, including a motion for severance of the counts, a motion for suppression of evidence obtained as a result of the issuance of the search warrants, a motion for discovery and inspection, and a motion for change of venue. All of these motions were overruled by the trial court.

Subsequent to his arraignment in the district court, the appellant requested that funds be allocated to enable him to employ a psychiatrist to inquire into his mental condition. This motion was granted and appellant employed the Menninger Foundation at Topeka, Kansas, to make such examination. Upon completion of this examination the state moved the court for appointment of a sanity commission to inquire into the appellant's ability to comprehend his position and aid in his defense. This motion was also sustained. The sanity commission, consisting of three psychiatrists, conducted an examination of the appellant and found he was able to comprehend his position and aid in his defense.

The appellant presented a motion to waive jury trial to the court on May 1, 1970. During these proceedings, the following colloquy was had between the court and the appellant:

"The Court: Mr. Lamb, in connection with your request that a jury trial be waived in this case, are you under any duress or coercion of any kind or nature with respect to waiving or not waiving a jury trial?

"A. I am not.

"The Court: Have any promises or on the other hand, threats been made to you in connection with the matter of waiver of jury trial?

"A. No, your Honor.

"The Court: Then I understand that you are waiving it freely and voluntarily; is that correct?

"A. That is correct.

"The Court: Do you have any questions whatsoever as to the imposition of punishment in this case? Do you understand clearly that if the jury were

to hear the case, they would determine your guilt or innocence, and also the punishment? Do you understand that?

"A. Yes, I do.

"The Court: Do you understand that if a jury is waived, and approved by the state and the Court, that the Court then would be under an obligation to determine your guilt or innocence to charges, and also the punishment?

"A. I understand that.

"The Court: Have you discussed this matter with your counsel on a number of occasions?

"A. Quite a few occasions, yes.

"The Court: How many occasions would you say that you have discussed it with your counsel?

"A. At least a dozen.

"The Court: Very well. Is it your decision to waive a jury or your counsel's decision to waive a jury?

"A. They left the decision up to me and it is mine.

"The Court: Do you understand, sir, that the punishment upon a finding' of guilt in this case must necessarily be either life imprisonment or death?

"A. I do."

Following this waiver the case proceeded to trial before the court and the state presented evidence by way of testimony and exhibits and then rested its case. Both during the trial and after the prosecution had rested its case, the appellant asked the court to rule as to whether or not he had been proved guilty beyond reasonable doubt, prior to any introduction of evidence as to the defense of insanity. The court, in making its determination, held that it only had to decide whether a *prima facie* case had been made against the appellant, and the court so found.

The appellant then proceeded to offer testimony of two psychiatrists, Dr. Joseph Satten and Dr. Hector Cavallin, both of whom testified that in their opinion the appellant did not understand the nature and quality of his acts, nor was he able to distinguish between right and wrong. Following the testimony of Dr. Cavallin and Dr. Satten, the state requested the court to require the appellant to submit to a psychiatric examination by the state's experts, prior to their testifying as to their opinions regarding the defendant's sanity or insanity at the time of the commission of the offenses charged. The appellant objected to this motion and it was denied by the court.

At the close of his expert psychiatric testimony the appellant rested his case. In rebuttal the state then presented the testimony of three psychiatrists, Dr. Herbert Spiegel of New York City, New

York, Dr. Wiliam McKnelly of the University of Kansas Medical Center of Kansas City, Kansas, and Dr. Warren G. Phillips, a practicing psychiatrist in Johnson County, Kansas. All three psychiatrists testified they considered the same things (enumerating and making specific reference to them) in arriving at their opinions as to the appellant's sanity that the psychiatrists for the appellant had considered, with one exception. They had not had an opportunity to personally consult with the defendant over an extended period of time, nor did they have an opportunity to administer certain psychological tests to the defendant. However, they did testify that, based on their examination and in their opinions, the defendant was capable of distinguishing right from wrong at the time of the commission of the three crimes charged. Following this rebuttal testimony the state rested its case. The matter was then submitted to the court for a decision following oral arguments by both parties. At the conclusion of all the evidence and following the arguments of counsel, the trial court found beyond a reasonable doubt that the appellant was guilty of the three crimes charged: Two counts of kidnapping in the first degree and one count of murder in the first degree.

Our review will consider the appellant's eleven specifications of error in the order of their presentation on appeal.

## I.

The appellant contends the trial court erred in denying his motion to change venue. The appellant states one of the reasons he decided to waive trial by jury was the refusal of the trial court to grant his request for a change of venue.

Because of local media publicity, appellant argues that a fair trial by jury could not be had in Johnson County, and the denial of a change of venue "forced" him to waive his constitutional right to trial by jury.

Therefore, as appellant reasons, being "forced" into a waiver of his right to trial by jury because of the trial court's ruling on his motion for change of venue, his waiver of trial by jury was involuntary and thus unconstitutional.

We fail to see merit in the appellant's argument. The appellant's decision to either waive or not waive a trial by jury is a matter of trial tactics.

In Cipes, *Criminal Defense Techniques*, Vol. 1, § 9.04, it was said:

"A decision to waive the jury is the best way to avoid the effects of prejudicial publicity, at least theoretically. An appeal from a jury-waived trial, based on an allegation that the defendant was not afforded a fair trial, will probably fail barring flagrant abuses by the judge or obviously prejudicial influences upon witnesses. . . ."

Wholly aside from the foregoing, the law in Kansas is clear that the trial court may, in its discretion, properly deny a motion to change venue, when the defendant fails to present affirmative evidence that prejudice exists so as to make it reasonably certain he could not obtain a fair trial.

This court, in *State v. Anderson*, 202 Kan. 52, 446 P. 2d 844, restated the law as follows:

". . . The allowance or refusal of an application for change of venue rests largely in the discretion of the trial court. (*Hanson v. Hanson*, 86 Kan. 622, 122 Pac. 100; and *Krehbiel v. Goering*, 179 Kan. 55, 293 P. 2d 255.)" (p. 55.)

The court then went on to say:

"In the recent case of *State v. Poulos*, 196 Kan. 253, 411 P. 2d 694, cert. den. 385 U. S. 827, 17 L. Ed. 2d 64, 87 S. Ct. 63, it was said:

" 'The defendant's failure to present affirmative evidence that prejudice existed so as to make it reasonably certain he could not obtain a fair trial, requires a conclusion that his evidence was totally and completely insufficient to permit the district court to order a change of venue. . . .' (p. 259.)" (p. 55.)

In his application for change of venue, the appellant alleged the inhabitants of the district in which the trial was to be held were prejudiced against him to the extent that he could not receive a fair trial in the district.

In support of appellant's motion for a change of venue, he filed with the trial court defendant's Exhibits A and B. Exhibit A consisted of an affidavit of an employee of the Kansas City Times in which the affiant stated the newspaper clippings attached to the affidavit were generally and widely circulated throughout Johnson County, Kansas. Exhibit B consisted of an affidavit of the publisher of the Olathe Daily News, in which the affiant stated the newspaper clippings attached to the affidavit were generally and widely circulated throughout Johnson County, Kansas. These are the only two affidavits filed by the appellant in support of his motion for a change of venue. There was no testimony or affidavit presented to the trial court that any inhabitant of Johnson County, Kansas, was prejudiced against the appellant.

The appellant in his argument required the court to assume such prejudice because the matter was widely covered and reported by the news media. Even though the appellant has shown his case received a great amount of publicity, it does not follow, without further evidence, that such prejudice existed as would deny the appellant a fair trial.

In *State v. Welch*, 121 Kan. 369, 247 Pac. 1053, it was said:

". . . It is not enough that the petition state prejudice exists and a fair trial cannot be had. Specific facts and circumstances showing prejudice must be stated, and not conclusions. (*State v. Knadler*, 40 Kan. 359, 19 Pac. 923.) . . ." (p. 372.)

In light of the colloquy between the trial court and the appellant on the record concerning his waiver of jury trial, we hold the waiver was freely and voluntarily made by the appellant, and the trial court did not err in overruling the appellant's motion for change of venue.

## II.

Appellant next contends the trial court erred in failing to suppress evidence obtained through the two searches of appellant's residence.

Appellant argues the issuance of the search warrant of January 16, 1970, should have been quashed for lack of probable cause.

The state based its approach in obtaining this search warrant on a showing of similarity between the Childs kidnapping and the Kemmerly kidnapping.

The trial court, in hearing appellant's motion to quash the search warrants, enumerated the similarities between the two kidnappings in the following manner:

"That with respect to the search warrant issued on January 16, 1970, in both Miss Childs' and Karen Sue Kemmerly's kidnapping, that a number of similarities were shown to exist, by the evidence presented to the Magistrate. Among those similarities were the following:

"One, that both Miss Childs and Karen Sue Kemmerly were reported missing from shopping centers, one being reported missing from the Ward Parkway Shopping Center, and the other from the Metcalf South Shopping Center, both being located in the southerly part of the Kansas City area, and both being within a few miles of past [sic] distance.

"Another similarity was that the defendant was known to have dressed as a woman, and that there were reports of a man dressed as a woman accosting women in the Metcalf South Shopping Center.

"That another similarity would be that both girls were transported to rural areas between Fort Scott and Olathe. That Miss Childs was sexually assaulted and that Miss Kemmerly had had sexual intercourse.

"That the topography where the offenses occurred were similar. That is, the body of Miss Kemmerly was found in a hedge row.

"That Miss Patricia Childs was taken off of a rural road. There was a similarity in that Patricia Childs was forced to disrobe, and that Karen Sue Kemmerly was found nude.

"There was a similarity in that the defendant had exhibited a knife to Patricia Childs, and that Karen Sue Kemmerly had been stabbed with a knife-like instrument five times.

"There was a similarity in that it was known that the defendant had kidnapped another woman on another occasion, which information was obtained by the witnesses from Under-Sheriff—from the Under-Sheriff of Bourbon County, and an FBI agent who had actually worked on the other kidnapping case.

"There was a similarity in that the defendant had kidnapped a guard at knife point, according to the evidence presented to the Magistrate.

"There was a similarity in that the defendant at the time of his arrest or immediately prior thereto, was driving a white over brown 1963 model automobile, and a brown older model automobile was seen in the vicinity of the field where the body of Karen Sue Kemmerly was found.

"There was a similarity in that the defendant had a knife on his person at the time of his arrest. This Court is satisfied that these are not mere beliefs or suspicions upon the part of the officers who testified before the Magistrate who then issued the search warrant."

A similar, but more inclusive, list of similarities between the Childs kidnapping and the Kemmerly kidnapping was recited by the court in its determination that there was probable cause for the issuance of the search warrant issued January 28, 1970.

The appellant further charges there was not sufficient proof of the reliability of the hearsay information received by the officers to provide the magistrate with a rational basis for making a finding of probable cause. While considering this argument of the appellant, it should be observed that in the case under consideration the court is not faced with a situation involving an unnamed confidential "reliable informant" who is providing information upon which a magistrate is then requested to issue a warrant.

Here involved are citizen informers and police officers, all of whom are treated differently under the law. Their testimony is not viewed with such rigid scrutiny as is the testimony of a "police informer." (See *State v. Braun,* 209 Kan. 181, 495 P. 2d 1000, and cases cited therein.) The rationale for such differentiation is set out in *State v. Paszek,* 50 Wis. 2d 619, 184 N. W. 2d 836 [1971].

At the hearing held upon application for this search warrant, officers Sparks, Lane and Foote testified in person.

Probable cause to arrest refers to that quantum of evidence which would lead a prudent man to believe that the offense has been committed. (*Henry v. United States,* 361 U. S. 98, 102, 4 L. Ed. 2d 134, 80 S. Ct. 168 [1959].) It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the information led a reasonable officer to believe that guilt is more than a possibility, and it is well established that the belief may be predicated in part upon hearsay information. (*Draper v. United States,* 358 U. S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329 [1959].) The quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case. (*Wong Sun v. United States,* 371 U. S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 [1963].)

Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. (*Carroll v. United States,* 267 U. S. 132, 162, 69 L. Ed. 543, 45 S. Ct. 280 [1925].)

Evidence sufficient to support probable cause for an arrest on the part of an arresting officer is also sufficient to support a finding of probable cause by a magistrate in the issuance of a search warrant.

We have no hesitance upon the record here presented in upholding the trial court's decision that the magistrate, who issued the search warrant here in question, had sufficient evidence before it to warrant a finding of probable cause.

Appellant next contends the evidence presented to the magistrate at the time of the issuance of the two search warrants was incorrect and misleading.

In the absence of statutory authorization to the contrary, it is generally held a person against whom a search warrant is directed may not dispute the matters alleged in the affidavit or complaint supporting the warrant. (Wharton's Criminal Procedure, Vol. 4, § 1545, p. 168.) This point finds further support in the annotation to *Smith v. State,* 191 Md. 329, 62 A. 2d 287, 5 A. L. R. 2d 386, wherein it is stated:

"The result of the decisions involving the point under annotation may be concisely summarized. A large majority of the cases deciding the question

apart from governing statutory provisions take the position that one against whom a search warrant is directed may not dispute the matters alleged in the affidavit or verified complaint supporting the warrant. . . ." (5 A. L. R. 2d 396.)

Recent cases to the same effect are: *Liberto & Mothershed v. State,* 248 Ark. 350, 451 S. W. 2d 464 (1970); *Tucker v. State,* 244 Md. 488, 224 A. 2d 111, cert. denied 386 U. S. 1024, 18 L. Ed. 2d 463, 87 S. Ct. 1381 (1966); *Owens v. State,* 217 Tenn. 544, 399 S. W. 2d 507 (1965); *The People v. Bak,* 45 Ill. 2d 140, 258 N. E. 2d 341 (1970); *People v. Thornton,* 161 C. A. 2d 718, 327 P. 2d 161 (1958); and *State v. Edwards,* 311 P. 2d 266 (Okl. Cr. 1957).

Appellant contends also that Johnson County sheriff's officers, although in the company of Bourbon County officers at the time of the execution of the search warrants here in question, had no authority to execute such warrants outside Johnson County, Kansas. K. S. A. 19-812 provides:

"The sheriff, in person or by his undersheriff or deputy, shall serve and execute, according to law, all process, writs, precepts and orders issued or made by lawful authority and to him directed, and shall attend upon the several courts of record held in his county, and shall receive such fees for his services as are allowed by law."

This court held long ago that a sheriff of a county within this state was authorized to serve process outside his county. In *State, ex rel., v. Dreiling,* 136 Kan. 201, 14 P. 2d 644, the court said:

". . . It is contended in a petition for rehearing that a sheriff has no more authority to go outside the county to serve criminal process issued by a justice of the peace than a constable [has].

"The statute defining the authority of sheriffs contains no limitation similar to that contained in the statute relating to constables, and grants general authority to execute process issued and delivered to him. (R. S. 19-812.) Because there is no territorial limitation on the authority of a sheriff to execute a warrant of arrest, the contention is not well founded." (p. 202.)

Finally, appellant questions whether or not a magistrate has authority or jurisdiction to issue a search warrant to be executed outside the territorial jurisdiction of his court, but he cites no authority to support his position.

K. S. A. 62-1830 was in effect at the time the two search warrants in question were issued. This statute was later repealed, effective July 1, 1970.

K. S. A. 62-1830 provides:

"A warrant shall issue upon affidavit or upon oral testimony given under oath and recorded before the magistrate or judge. If the magistrate or judge

is satisfied that there is probable cause for the issuance of a warrant, he shall issue such warrant describing the property to be searched for and seized and naming or describing the person, place or means of conveyance to be searched. *The warrant shall be directed to any peace officer of the state of Kansas, or one of its governmental subdivisions who is authorized to enforce or assist in enforcing any law thereof.* It shall state the grounds for its issuance, and shall command the officer to search the person, place, thing, or means of conveyance named for the property specified, and to seize such property and hold the same in accordance with the law." (Emphasis added.)

In *A. T. & S. F. Rld. Co. v. Rice,* 36 Kan. 593, 14 Pac. 229, this court said:

".  .  . A justice of the peace is a township officer, under the constitution, and cannot be a county officer or a state officer. It is true that justices of the peace are in some sense 'justices of the peace *in their respective counties,*' and also *in the state;* it is true that a justice of the peace may, within his own township, perform the duties of an examining magistrate in cases, or hear cases, arising *in any part of his county;* and it is also true that he may, within his own township, issue criminal process *to be served in any part of the state;*  .  .  ." (p. 598.)

*State v. Durein,* 65 Kan. 700, 703, 70 Pac. 601, is to the same effect.

Under K. S. A. 62-1830, a search warrant issued by a magistrate within the confines of his jurisdiction, can be served anywhere within the state of Kansas. That statute provides the warrant shall be directed to any peace officer of the state of Kansas or one of its governmental subdivisions. (But see K. S. A. 1971 Supp. 22-2503, effective July 1, 1970.)

Accordingly, the trial court did not err in upholding the issuance of the search warrants in question or their execution.

## III.

The appellant requested an order directing the county attorney to produce for inspection all oral and written statements, and written memorandum of statements, given by any witnesses endorsed on the information filed by the state. The appellant asserts the refusal of the trial court to grant this request as error.

Appellant states in his brief he is mindful of the case authority which precludes him from receiving the requested information before trial. Nevertheless, the appellant suggests we reverse our prior decisions.

Prior to the passage of the new Kansas code of criminal procedure, which became effective July 1, 1970 (not here applicable), the rules governing discovery in criminal proceedings were de-

lineated by case law rather than statute. (See K. S. A. 1971 Supp. 22-3212 and 22-3213.)

Under the law here applicable the granting or denial of an application for discovery or inspection of documents in the custody of the prosecution lay within the sound judicial discretion of the trial court, and a ruling by the trial court could not be disturbed absent an abuse of discretion. The court stated in *State v. Oswald,* 197 Kan. 251, 417 P. 2d 261:

"The granting or refusal of the accused's request for the production or inspection of a writing for purposes of cross examining the witness lies in the discretion of the trial court, and in the absence of an abuse of discretion no error can be predicated thereon. . . ." (p. 262.)

See *State v. Young,* 203 Kan. 296, 454 P. 2d 724, and cases cited therein, for an extended discussion on this point.

The appellant has failed to make it affirmatively appear the trial court abused the exercise of its power of discretion in denying his request to produce for inspection statements given by witnesses endorsed on the information filed by the state.

## IV.

The appellant contends the trial court erred in its refusal to grant his request to sever Count I (Childs kidnapping) from Counts II and III (Kemmerly kidnapping and murder).

Where separate and distinct felonies are charged in separate counts of an information and all of the offenses are of the same general character, requiring the same mode of trial, the same kind of evidence, and the same kind of punishment, a defendant may be tried upon all the several counts of the information in one trial. The determination of such matter rests in the sound discretion of the trial court. (*State v. Coleman,* 206 Kan. 344, 346, 480 P. 2d 78; and cases cited therein.)

In the instant case the offenses charged in the three counts of the information are clearly of the same general character, require the same mode of trial, the same kind of evidence, and the same kind of punishment. They clearly fall within the guidelines set out in *Coleman,* supra.

## V.

Appellant contends the trial court erred in failing to quash Count III of the information or, in the alternative, to require the state to elect to proceed between alternative theories.

Count III of the information reads in part as follows:

". . . THOMAS P. LAMB did then and there unlawfully, feloniously, willfully and deliberately with premeditation and malice aforethought *and* while in the perpetration of a felony, to-wit: Kidnapping, did kill and murder a certain human being, to-wit: Karen Sue Kemmerly, by the strangulation of said Karen Sue Kemmerly." (Emphasis added.)

Appellant complains he was prejudiced in that he was deprived of any knowledge as to which theory of first degree murder the state intended to rely upon. The state by pleading Count III in the language set out clearly apprised the appellant that it was proceeding on both theories of first degree murder and that it intended to produce evidence on both theories.

The three cases cited by appellant to support his position *(State v. Baker,* 197 Kan. 660, 421 P. 2d 16; *State v. Kamen,* 166 Kan. 664, 203 P. 2d 176; and *State v. Blaser,* 138 Kan. 447, 26 P. 2d 593) are distinguishable. These cases concerned a lack of specificity in pleading rather than too much.

In *State v. Roselli,* 109 Kan. 33, 198 Pac. 195, it was said:

". . . Every murder committed by any kind of willful, deliberate and premeditated killing, is murder in the first degree. Use of poison, lying in wait, and killing in perpetrating or attempting to perpetrate arson, rape, robbery, burglary, or other felony, are stautory equivalents for the deliberation and premeditation essential to murder in the first degree. . . ." (p. 35.)

In *State v. Keleher,* 74 Kan. 631, 87 Pac. 738, it was said, "Proof that a homicide was committed in the perpetration of a felony is held tantamount to the premeditation and deliberation which otherwise would be necessary to constitute murder in the first degree." (p. 635.)

Recent cases discussing the felony murder rule more fully are: *State v. Turner,* 193 Kan. 189, 392 P. 2d 863; *Allen v. State,* 199 Kan. 147, 427 P. 2d 598; and *State v. Moffitt,* 199 Kan. 514, 431 P. 2d 879.

On this state of the law it cannot be said the appellant was prejudiced because the state was proceeding on both theories. Count III was not pleaded in the alternative, and the appellant was thereby advised the state did intend to proceed on both theories. A review of the record discloses sufficient evidence upon which the trial court could find the appellant guilty of murder in the first degree on either or both theories. Admissions and incriminating statements made by the appellant to the expert psychiatric witnesses who testified on his behalf, and the admissions made to the hostage, Mr. Midyett, buttressed the circumstantial evidence.

## VI.

The appellant assigns as error the trial court's refusal to permit him to present his defense in two stages, *i.e.*, a bifurcated trial. The appellant contends he should first have been permitted to present evidence in an attempt to raise a reasonable doubt as to his guilt, and then, if unsuccessful in this endeavor, to proceed with the presentation of evidence as to his alleged insanity at the time of the commission of the offense. There are a few jurisdictions within the United States where a bifurcated trial is authorized by statute alone. (See *People v. Cordova,* 14 C. 2d 308, 94 P. 2d 40 [1939]; *Bennett v. State,* 57 Wis. 69, 14 N.W. 912 [1883]; *Castro v. People,* 140 Colo. 493, 346 P. 2d 1020 [1959]; and *People v. Wells,* 33 C. 2d 330, 202 P. 2d 53, cert. denied 338 U. S. 836, 94 L. Ed. 510, 70 S. Ct. 43 [1949].)

The appellant's argument is that in presenting his defense on the issue of insanity it would become necessary for him to incriminate himself.

In the absence of any statute or rule of law recognized in Kansas, which would authorize the trial court to grant defendant's request for a bifurcated trial, we find no error in the trial court's refusal to do so. (See *State v. Shaw,* 106 Ariz. 103, 471 P. 2d 715.)

## VII.

Appellant alleges the trial court erred in holding the M'Naghten rule to be the proper test for the defense of insanity in Kansas.

Appellant concedes that a majority of American courts have adopted the M'Naghten rule, including Kansas. However, the appellant earnestly argues the rule in Kansas as to insanity should be changed.

The leading case in Kansas on this question is *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739, where the court clearly sets out its reasoning in holding the M'Naghten rule to be the proper test to be administered.

Absent any clear and compelling reason to depart from this well established rule, we decline to do so.

## VIII.

The appellant contends the expert witnesses who testified on behalf of the state concerning the appellant's sanity at the time of the commission of the alleged offenses should not have been permitted to testify due to the lack of a proper foundation for their

testimony. The appellant concedes the qualifications of the state's expert witnesses.

Each of the state's experts testified that in arriving at his opinion as to the appellant's sanity he considered some ten different items ranging from appellant's Naval Reserve medical file to Dr. Joseph Satten's written report concerning the appellant.

Dr. Satten and the other psychiatric expert who testified on behalf of the appellant testified that they considered the same material considered by the state's experts. But, in addition, they had each had an opportunity to interview the appellant and conduct certain psychological testing on him.

The experts for the state candidly admitted on cross-examination that they would be better equipped to give an opinion as to the sanity of the appellant had they been afforded an opportunity to interview and test the appellant. However, they went on to state that they could formulate an opinion as to the appellant's sanity based on the items which they had considered, along with their training, experience and professional expertise.

The state did request an opportunity to have its experts examine the appellant. However, the appellant objected and his objection was sustained by the court. Appellant now requests this court to allow him to benefit from his refusal to permit the state's experts to examine him.

It is settled in this jurisdiction that if a defendant's mental responsibility for crime is put in issue, his mental responsibility for the crime becomes an essential issue which must be proved by the prosecution beyond a reasonable doubt. (*State v. Crawford*, 11 Kan. 32; *State v. McBride*, 170 Kan. 377, 381, 226 P. 2d 246; and *Wolcott v. United States*, 407 F. 2d 1149 [10th Cir. 1969].)

The competency of an expert witness to give an opinion concerning matters of expertise lies largely within the trial court's discretion, and its ruling will not be set aside on appeal in the absence of a clear showing of abuse. (*State v. Jefferson*, 204 Kan. 50, 460 P. 2d 610; and *United States v. Kienlen*, 415 F. 2d 557 [10th Cir. 1969].)

The objection of the appellant to the testimony of the state's expert witnesses goes only to the weight of their testimony, and not to its admissibility.

The trial court did not abuse the exercise of its power of discretion in permitting the state's expert psychiatric witnesses to testify.

## IX.

The appellant contends insufficient evidence was presented at the trial for the court to find him guilty of all crimes with which he was charged.

He argues there was insufficient evidence to sustain the conviction on the two counts involving the kidnapping and the murder of Miss Kemmerly. This court's function, when considering the sufficiency of circumstantial evidence competent to sustain a criminal conviction, is limited to ascertaining whether there was basis in the evidence for a reasonable inference of guilt. (*State v. Patterson*, 200 Kan. 176, 434 P. 2d 808.) As previously stated under point V, *supra*, a review of the record discloses a sound basis in the evidence for a reasonable inference that the appellant murdered Karen Sue Kemmerly *during the perpetration of her kidnapping*.

The admission made by the appellant to Mr. Midyett, the hostage taken in making his escape from the Johnson County jail, and the incriminating statements made by the appellant to his expert psychiatric witnesses, which was the subject of their testimony in his defense on the issue of insanity, buttressed the circumstantial evidence in considerable detail.

The evidence was sufficient to support the appellant's conviction on each of the counts charged.

## X.

Appellant next maintains that since K. S. A. 21-403 makes no provision for allowing the court, when it sits as a jury, to make a disposition of the defendant following his conviction for first degree murder, he was improperly sentenced.

Apparently appellant chooses to ignore the fact that at the time he waived his jury trial he voluntarily agreed to and requested an imposition of sentence by the court.

At one point in the hearing on appellant's motion to waive jury trial, the following colloquy was had between Mr. Lowe, defense counsel, and the appellant:

"Q. Now, do you in view of those absolute and constitutional rights that you have and that I have just reviewed with you, and that we have heretofore reviewed privately, do you ask that the Court waive the jury trial and try the case to the Court?

"A. I do.

"Q. And you would likewise request then that the sentence, if any is imposed, if you are found guilty on any charges, that any sentence imposed be imposed by Judge Riggs; is that correct?

"A. That is correct.

"Q. Realizing that if a jury tried this case that a jury would have the obligation under the law to also impose the sentence; you realize that?

"A. I understand that."

The argument raised by the appellant herein has been squarely dealt with by this court in *State v. Burnett*, 194 Kan. 126, 397 P. 2d 346, where it was said:

". . . it is clear that the trial judge, in a case where the plea is 'not guilty' and a jury is waived—is empowered to fix the punishment. Who else could? . . ." (p. 131.)

In light of the foregoing we hold the trial court committed no error in pronouncing sentence on the appellant.

## XI.

Finally, appellant contends the trial court erred in overruling his application to defer sentencing pursuant to K. S. A. 62-1534, *et seq*.

This court's construction of the pertinent statutes can be found in *State v. Daegele*, 193 Kan. 314, 319, 393 P. 2d 978, cert. denied 379 U. S. 981, 13 L. Ed. 2d 571, 85 S. Ct. 686.

A careful perusal of the statutes in question clearly shows their use is discretionary with the trial court. Our review of the evidence reveals no abuse of discretion on this point.

The judgment of the lower court is affirmed.