**Thomas P. LAMB, Plaintiff,**

v.

**Tony RIZZO, Defendant.**

**No. 02–1282–JTM.**

United States District Court,
D. Kansas.

Jan. 31, 2003.

Thomas P. Lamb, El Dorado, KS, pro se.

Timothy K. McNamara, Michael J. Abrams, Todd A. Rogers, Lathrop & Gage, L.C., Kansas City, MO, for defendant.

*MEMORANDUM ORDER*

MARTEN, District Judge.

The present libel action was begun by plaintiff Thomas Lamb in Butler County, Kansas District Court. The defendant, Tony Rizzo, removed the action to this court. Lamb has moved to remand the action to state court. Rizzo has moved to dismiss the action.

Lamb's Motion to Remand is predicated on an alleged lack of diversity and the pro se plaintiff's allegation that he is not "well versed in federal law." (Dkt. No. 9, at 3). Remand is not appropriate because the

face of the pleadings establishes complete diversity. According to Rizzo, although he does indeed work in Kansas, he resides in Missouri. Rizzo represents that he has lived continuously in Missouri since 1981, that he has resided at his current address in Kansas City, Missouri since 1991, that he has never lived in Kansas. Remand on the basis of a supposed lack of diversity is not appropriate in light of these averments. Further, Lamb's alleged lack of familiarity with federal law does not justify remand. The present action will be decided on the basis of Kansas substantive law.

In December, 1969, Lamb kidnapped and murdered Karen Sue Kemmerly, who was then 24 years old. Kemmerly's nude body was found in rural Johnson County on December 7, 1969. In January, 1970, he kidnapped Patricia Ann Childs, who was then 18 years old. Lamb demanded ransom from Childs' parents, which they agreed to pay. Law enforcement officers staked out the scene of the ransom payment, and were able to apprehend him after a high speed car chase.

The present action arose after defendant Rizzo, a reporter for The Kansas City Star, wrote two articles about Lamb in mid–2001, as Lamb was scheduled for an upcoming parole hearing. Following the articles, and the denial of his requested parole, Lamb brought the present action for libel.

Specifically, Lamb complains that the articles by Rizzo contained statements that (1) he was convicted of both killing and raping Kemmerly in 1969 and kidnapping and raping Childs in 1970; (2) he was arrested "after a chase and shootout that left one police officer seriously injured;" (3) that he fooled prison officials into recommending him for parole in 1969; and (4) he sought to obtain victims during 1969 and 1970 by "prowl[ing] area shopping centers, dressed as a woman." (Def.Exh. K). Lamb argues that these allegations are defamatory because he alleges that (1) he was never charged with rape as to either of his victims and that his second victim "told several different stories"; (Dkt. No. 15 at 8); (2) while an officer may have been shot while officers were pursuing him, the shot came from another officer and was in any event "not life threatening," (Id., at 5); (3) "there is no indication that he fooled anyone into recommending him for parole," (Id.); and (4) while Lamb "did abduct Ms Childes [sic] from a shopping center, [I] was fully dressed as a male at that time." (Id. at 6).[1]

Lamb was convicted of kidnapping and murder and sentenced to three consecutive life terms. The circumstances surrounding his crimes were described in detail by the Kansas Supreme Court in *State v. Lamb*, 209 Kan. 453, 455–61, 497 P.2d 275, 279–82 (1972), *overruled in part, State v. Jacques*, 225 Kan. 38, 587 P.2d 861 (1978), where his convictions were affirmed on appeal:

> Karen Sue Kemmerly left her home in Kansas City, Missouri, at approximately 10:00 o'clock on the morning of December 2, 1969, to go shopping.

> She was attired in a gray plaid dress with a chain-link belt. In her possession was a number of credit cards issued to her as well as a checkbook, billfold and wrist watch in good condition. Miss Kemmerly's departure from home in her 1967 green Mustang was witnessed by her mother, Mrs. Dorothy Moberly.

---

**1.** Lamb also argues, in responding to defendant's contention that he is libel proof, that defendant errs in stating that he "threatened innocent civilians, twice taking a civilian hostage." Lamb states that, in his four escape attempts, he has only once threatened an innocent civilian and taken a hostage. (Dkt. No. 15, at 8).

The Mustang contained an electronic garage door opener.

Later, on the morning of December 2, 1969, Dorothy Hamilton, a clerk in the Chasnoff Store in Ward Parkway Shopping Center, sold a purse to Miss Kemmerly. Erwin Sterm, an employee of the Caldwell Store in the shopping center, on the same morning sold a pair of shoes to Karen Sue Kemmerly. The shopping center is located on the east side of State Line Road in southern Kansas City, Missouri.

On December 3, 4 and 5 an officer of the Leawood, Kansas, police department, while on routine patrol, observed Miss Kemmerly's 1967 Mustang parked in the Ward Parkway Shopping Center. The officer examined the vehicle on at least one occasion and observed a woman's gray plaid dress with a chain-link belt, as well as other articles of women's clothing, folded and placed on the right front seat of the automobile. This vehicle and the clothing were later identified by Mrs. Moberly as belonging to her daughter. The clothing was the same clothing her daughter had been wearing when she left the family home the morning of December 2, 1969.

While quail hunting with two friends on December 7, 1969, Vernie Rome discovered the body of a nude female lying in a hedgerow. The body was found in a rural area of Johnson County, Kansas, approximately three miles south and east of Olathe, Kansas. Mr. Rome promptly telephoned the Johnson County sheriff's office to report the discovery. An on-the-scene investigation by the officers established the body was covered with snow and that neither any clothing of the victim nor any possible murder weapon could be found in the vicinity of the body.

Subsequent to its discovery, the body was transported to the Amos Brothers Funeral Home in Shawnee, Kansas, where an autopsy was performed by Dr. James Bridgens, a pathologist with extensive experience in that field. Mrs. Dorothy Moberly identified the body as being that of her daughter, Karen Sue Kemmerly.

After positive identification of the body, the 'Metro Squad' of the greater Kansas City area was activated and an intensive investigation ensued. During the course of the investigation, Miss Kemmerly's Mustang automobile was processed and a partial fingerprint was taken from the right front seat support. Despite the intensive investigation conducted by the 'Metro Squad,' no charges were filed against anyone between December 7, 1969, the date the body was discovered, and January 16, 1970.

Patricia Ann Childs, an eighteen-year-old college coed, left her home in Overland Park, Kansas, on January 15, 1970, to go shopping at the Metcalf South Shopping Center. The Metcalf South Shopping Center is only a few miles distant from the Ward Parkway Shopping Center.

Miss Childs testified that after shopping approximately forty-five minutes, she proceeded to her car in the parking lot surrounding the shopping center and started to enter the driver's side of her vehicle when the appellant placed a gun in her side and pushed her into her automobile.

After asking for and receiving the vehicle's keys from Miss Childs, the appellant proceeded to drive around the parking for several minutes. He then stopped the car, parked it a few spaces distant from where it had originally been parked, and proceeded to wipe his fingerprints from the interior of the automobile with a handkerchief. Appellant then forced Miss Childs out of her vehicle and into his own automobile, a

brown Plymouth. Prior to entering his own vehicle, the appellant also wiped his fingerprints from the exterior of Miss Childs' automobile.

The appellant tied Miss Childs' hands with a leather strap, drove out of the shopping center, and headed south on U.S. Highway No. 69.

The appellant drove past Olathe, Kansas, and Pleasanton, Kansas, and then made a short stop in Fort Scott, Kansas, during which he telephoned someone to tell them he would not be home that evening.

The appellant then drove his automobile into a rural area outside Fort Scott and pulled off the roadway. At this time the appellant first ordered Miss Childs to disrobe and get into the back seat of his car. Miss Childs testified appellant informed her she would not be hurt if she did as she was told. While Miss Childs was disrobing appellant picked up her purse and began rummaging through it, asking her if she had any credit cards belonging to either her or her father. Her reply was in the negative.

After disrobing, Miss Childs placed her clothing on the floorboard of the automobile. Appellant then picked up the articles of clothing and placed them on the right front seat of the vehicle. Miss Childs' hands were then taped and appellant had sexual intercourse with her.

Thereafter appellant again commenced driving his vehicle, and as best Miss Childs could tell, they proceeded to Pittsburg, Kansas, where he directed her to make a telephone call to her parents. Upon placing the call, Miss Childs' younger sister answered the phone and started questioning her. At this time Patricia was forced to hang up the phone. Appellant and Miss Childs then drove around the Pittsburg, Kansas, area and at one point stopped and ate at a small restaurant outside of Pittsburg. During this stop Miss Childs testified she made no attempt to escape because she was afraid of the appellant.

Later that same evening, January 15, 1970, a second call was placed by Miss Childs to her home in Johnson County, Kansas. That call was answered by Miss Childs' mother. The appellant told Miss Childs to inform her mother that she had been kidnapped. The appellant himself then talked to Mrs. Childs and demanded $3,500 for the safe release of Patricia. Mrs. Childs informed the appellant he should call back when her husband was there, at which time this conversation was concluded.

Approximately thirty minutes later another call was placed to the Childs' residence. At this time the appellant spoke with Joseph Childs, Patricia's father, and advised Mr. Childs to obtain $3,500 in one hundred dollar bills. He informed Mr. Childs if he did as he was told, Miss Childs would not be harmed, and further that he, the appellant, would call Mr. Childs the following day to give him directions as to how the transfer of money would take place.

Thereafter, the appellant drove around the Pittsburg and Fort Scott area for some time and then proceeded to a rural area, where, in a field several hundred feet off of a country road, Miss Childs was forced to remove her clothing a second time. The appellant again placed the clothing on the right front seat of the automobile after which he forced Miss Childs to submit to an act of sexual intercourse. Appellant and Miss Childs spent the night in the automobile parked at this location. The next morning they proceeded north toward Olathe, Kansas.

After arriving in Olathe the appellant drove his automobile around the area for

some time, and then made a telephone call to the Childs' residence from a drive-up phone on the south edge of town. At this time the appellant directed Mr. Childs to bring the $3,500 in one hundred dollar bills to the parking lot of the bowling alley in Olathe, where the exchange would be made. While awaiting Mr. Childs' arrival, the appellant continued to drive around the Olathe area, and at one point stated to Miss Childs, according to her testimony, 'I hope your dad does not bring the police, because I don't want to get caught. I can get hung for this because I kidnapped you and raped you.'

A short time later, Mr. Childs arrived in Olathe, met with the appellant and Patricia in the parking lot of the bowling alley and paid the ransom, at which time Patricia Childs was released by the appellant to her father. At this point, as the appellant commenced to drive away from the area, officers of the Overland Park police department and the Johnson County sheriff's office, who had staked out the area where the exchange was to take place, attempted to apprehend the appellant. A high speed automobile chase commenced which ended a short time later when the appellant crashed his vehicle into a police blockade at a speed of approximately eighty miles per hour. Following the crash, there was recovered from the appellant's wrecked vehicle a leather thong, tape, a 22 caliber blank pistol, a knife and sheath and $3,500 in one hundred dollar bills.

Although appellant was thrown from his vehicle at the time of the collision, he was not injured seriously. Appellant was first taken to a local area hospital where he received medical treatment for his injuries and later transferred to the Johnson County jail where he was booked and finger-printed.

Following the appellant's apprehension on January 16, 1970, the state made application to the Honorable Earle Jones, judge of the Johnson County magistrate court, division No. 2, for issuance of a search warrant for the premises of the Thomas Lamb residence in Fort Scott, requesting permission to search for certain articles belonging to Karen Sue Kemmerly.

The court issued the search warrant after hearing sworn testimony from witnesses, at least two of whom were officers of the law.

This warrant was then executed by officers of the Johnson County sheriff's office, Bourbon County sheriff's office, Fort Scott police department and the Kansas highway patrol on the 16th day of January, 1970. During the execution of this warrant, the shoes and purse purchased by Miss Kemmerly on the 2nd day of December, 1969, from Chasnoff's and Caldwell's in the Ward Parkway Shopping Center were located in the garage of the Lamb residence. Eight credit cards issued to Karen Kemmerly, as well as her wrist watch, in a damaged condition, and her checkbook covers were found in the Lamb home.

Subsequent to the issuance of the first search warrant on January 16, 1970, the known fingerprints of Thomas Lamb, taken from him at the time of his arrest, were transported to the Kansas City, Missouri, police department where a fingerprint identification technician compared them with the print lifted from Karen Sue Kemmerly's car on December 7, 1969. In the opinion of the technician, the fingerprint lifted off Miss Kemmerly's automobile was identical to the known fingerprint of the appellant.

On January 28, 1970, it was brought to the attention of the officers investigating the case by Mrs. Moberly that Karen's electronic garage door opener was also missing from her automobile.

At this point a second application was made requesting a search warrant for the residence of the appellant, and again sworn testimony was presented to the court in support of the application, following which the warrant was issued. The second search warrant was served by officers of both Johnson and Bourbon Counties on January 28, 1970. Recovered from the dresser of the appellant was the missing electronic garage door opener, which later tests revealed would open the garage door of Karen Sue Kemmerly's home.

Subsequent to appellant's arrest on January 16, 1970, he was charged with two counts of first degree kidnapping and one count of first degree murder. He was ordered held in the Johnson County jail at Olathe without bond. On January 21, 1970, while being held in the Johnson County jail, and with the help of a jail trustee, Pat McKey, the appellant obtained a 38 caliber pistol. He and the trustee then took three dispatchers and a jailer captive and escaped from the jail after locking the four sheriff's officers in a jail cell. The appellant and McKey then proceeded across the street from the courthouse to a small cafe where they took a patron, Loyd Midyett, hostage. The pair then commandeered Midyett's car and, with Midyett in their custody, sped south from Olathe, making good their escape from the Johnson County jail. The subjects were later spotted in the area of LaCygne, Kansas, where they were eventually apprehended at a roadblock without Midyett having suffered any physical harm. According to Midyett's testimony, at one point during this trip from Olathe to LaCygne, Lamb told McKey to look out the window to see if they were being followed, and at the same time, said that if they caught him now he would be hanged for sure, following which the hostage, Midyett, said,

'you haven't done anything yet to be hanged for,' and the appellant answered, 'Mister, I am a murderer.'

In 1997, the Kansas Court of Appeals reaffirmed Lamb's convictions. *Lamb v. State,* 938 P.2d 203 (1997) (table).

■ The defendant seeks dismissal on the grounds that the plaintiff's public reputation has been so demolished by his own actions that he cannot sustain an action for libel. Essentially, the argument is that Lamb is held in such contempt by the community that he could not have suffered any damages as the result of plaintiff's two articles. Although defendant has cited to no cases from Kansas adopting the libel-proof doctrine, it has been adopted in a number of other jurisdictions. For example, in *Ray v. Time, Inc.,* 452 F.Supp. 618 (W.D.Tenn.1976), the court held that, in light of his conviction for the murder of Martin Luther King, Jr., James Earl Ray could not maintain an action for libel against a publisher who alleged that he was a narcotics addict. *See, also Cardillo v. Doubleday & Co.,* 518 F.2d 638, 639 (2d Cir.1975). "[I]f there is little or no harm to a plaintiff's already low reputation, then the statements are not actionable." *Cerasani v. Sony Corp.,* 991 F.Supp. 343, 352 (S.D.N.Y.1998) (citation omitted).

The libel-proof plaintiff doctrine must be applied with caution, because few plaintiffs will have a reputation which is so awful that they are not entitled to obtain redress. *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 303 (2d Cir.1986). However, the court concludes that the doctrine has application here and bars plaintiff's claims. The court believes that the Kansas Supreme Court, if it were presented with the issue, would adopt the doctrine, and, upon reviewing the factual narrative of Lamb's crimes it previously recounted in *Lamb v. State,* would hold

that the doctrine applies to Lamb's complaint of libel.

Lamb's criminal convictions, and his own admissions herein, establish beyond any reasonable doubt that he is a kidnapper and murderer. He was convicted of both kidnapping and murdering Ms. Kemmerly. He was convicted of, and concedes in his responsive motion, that he kidnapped Ms. Childs. The Kansas Supreme Court, in denying Lamb's appeal, narrated the evidence of the sexual assault against Childs and Lamb's continued violent attempts to flee justice.

Lamb argues that he has not committed a new crime in over 15 years, and that several persons have submitted recommendations for his parole. If Lamb has not committed any recent offenses against the public, it is likely due to the fact that he has been isolated from society by the imposition of three consecutive life sentences. Further, even that isolation has not prevented him from periodically attempting his violent reentry into society at large. Lamb, for example, does not challenge that portion of defendant's motion which describes his 1979 escape from Kansas State Penitentiary, during which he stole a car and led officers on another high speed chase, or his 1987 escape from the Larned State Hospital, during which he threatened a farmer at knife point, stole his car, and led officers on yet another car chase.

This is not a case in which the substance of the plaintiff's reputation-destroying actions are in any doubt. Given the utter heinousness of the offenses which led to the plaintiff's three consecutive sentences of life imprisonment, the uncontroverted nature of those offenses, and the widespread notoriety attached to the convictions of the plaintiff as well as his periodic escapes from custody, the plaintiff has not and cannot present an actionable case of libel based upon the purported misstatements contained in Rizzo's articles.

IT IS ACCORDINGLY ORDERED this _____ day of January, 2003, that the plaintiff's Motion to Remand (Dkt. No. 9) is denied; defendant's Motion to Dismiss (Dkt. No. 6) is hereby granted.