**UNITED STATES of America**

v.

**Eugene BAYNES, a/k/a "Bo" et al.**

**Misc. No. 74–603, Crim. No. 74–523.**

United States District Court,
E. D. Pennsylvania.

July 3, 1975.

As Amended Aug. 5 and Sept. 5, 1975.

David J. McKeon and Albert J. Wicks, Philadelphia, Pa., for Government.

Barry H. Denker and F. Michael Medway, Philadelphia, Pa., for Eugene Baynes.

Morris H. Wolff, Philadelphia, Pa., for James Fox.

Nino Tinari, Philadelphia, Pa., for Eugene Hearn.

Joel Harvey Slomsky, Philadelphia, Pa., for Russell Barnes.

Robert Scandone, Philadelphia, Pa., for Barthaniel Thornton.

Salvatore Cucinotta, Philadelphia, Pa., for William Jefferson.

Joseph C. Santaguida, Philadelphia, Pa., for Ferris Foster.

Robert B. Mozenter, Philadelphia, Pa., for Gregory Trice.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

On May 15, 1974, acting pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (hereinafter Title III),[1] and in response to the sworn application of David J. McKeon, an attorney with the Organized Crime and Racketeering Section of the United States Department of Justice, we entered an order authorizing for a period of 20 days the interception of certain wire communications of James Fox, William Jefferson, Ferris Foster, Rus-

---

1. 18 U.S.C. §§ 2510–2520.

sell Barnes, Herschel Williams and others as yet unknown to and from the telephone located at the residence of James Fox in Upper Darby, Pennsylvania. The application was supported by a fifteen-page affidavit executed in our presence by Donn Jerre Miller, a special agent of the Drug Enforcement Administration of the United States Department of Justice (DEA). In entering the order for wire interception we made, *inter alia*, the following findings:

(1) that there was probable cause to believe that Messrs. Fox, Jefferson, Foster, Barnes, Williams, Barthaniel Thornton and others as yet unknown had been and then were committing offenses involving the distribution, possession of and possession with intent to distribute heroin;

(2) that there was probable cause to believe that particular wire communications concerning those offenses would be obtained through the interception applied for;

(3) that normal investigative procedures either had been tried and failed, or reasonably appeared unlikely to succeed if continued or reasonably appeared unlikely to succeed if tried; and

(4) that there was probable cause to believe that in carrying out the offenses against the narcotic laws, the individuals named were using the telephone located at 250 Beverly Boulevard, Upper Darby, Pennsylvania, bearing telephone number (215)284–3840.[2]

Wire interception was commenced pursuant to the order. Mr. McKeon filed with us the five, ten and fifteen-day reports required in the order, and, upon examination thereof, we permitted the interception to continue for the full period of twenty days. Evidence of narcotic trafficking was obtained from the wire interception, and in due course indictments were returned against Fox, Jefferson, Foster, Barnes, Thornton and three other individuals, Eugene Baynes, Eugene Hearn and Gregory Trice, who had not been named in the wire interception affidavit or order. In accordance with the provisions of Local Criminal Rule 2 (providing for random assignment of cases), the indictments were assigned for general pre-trial proceedings and trial to our colleague, the Honorable John B. Hannum.

Following the indictments, counsel for all defendants filed motions to suppress the wire interception. The motions were broadly based, attacking, *inter alia*, the constitutionality of the wire interception law, the propriety of the wire interception authorization, the sufficiency of the wire interception order, and the manner of execution of the wire interception. In the ordinary course of this Court's business, all pre-trial motions are heard by the judge to whom the case is assigned. However, Local Criminal Rule 16(b) provides that any motion attacking the "validity or sufficiency" of an order authorizing or approving the interception of a wire or oral communication issued by a judge of this Court shall be heard by that judge.[3] Accordingly, since we authorized the wire interception,[4] the motions to suppress the wire

---

2. Without such findings, no wire interception can be authorized. 18 U.S.C. § 2518.

3. Rule 16(b) represents an effort to accommodate the "law of the case" principle, which is the law in this circuit. *See United States v. Wheeler*, 256 F.2d 745 (3d Cir. 1958); *TCF Film Corporation v. Gourley*, 240 F.2d 711 (3d Cir. 1957). Under this principle, judges of coordinate jurisdiction sitting in the same court and in the same case may not ordinarily overrule the decisions of each other. The most oft advanced rationale of the "law of the case" principle is one of judicial comity

to preserve the orderly functioning of the judicial process. Under the aegis of Rule 16(b), only we could vacate our decision with respect to the validity or sufficiency of our order.

4. Pursuant to Local Criminal Rule 16(b) "[a]ll applications for wire interceptions shall be assigned on a random basis to each Judge of the Court, or in his absence the Emergency Judge, in accordance with the provisions of Local Civil Rule 3." We were assigned the wiretap application on a random selection basis as provided by the local rule.

communication came on for hearing before us.

As we began to consider the matter, a threshold problem emerged due to the fact that much of the asserted probable cause for the wire interception set forth in Agent Miller's affidavit was derived from several telephone conversations between an individual identified in the affidavit as "Government Informant SD 1–40026" and defendants Fox, Thornton, Barnes and Foster. At a pre-hearing conference, the Government represented to us that the conversations between the informant and the various defendants were monitored and recorded with the consent of the informant whom the Government willingly identified as Charles "Mickey" Robinson.[5] The Government contended that the monitoring was appropriate and within the consensual exception to Title III; moreover, it evinced its intention to offer the transcripts of the Robinson conversations as evidence in its case-in-chief at trial. A pre-trial motion which had been interposed by defendant Thornton asserted that Robinson did not, in fact, consent to the monitoring and that the use of the conversations must be suppressed at trial. Thornton further asserted that the lack of consent by Robinson vitiated the entire Miller affidavit and rendered our wire interception authorization unlawful.

Because Thornton's contentions might require us to address the validity of Robinson's consent in connection with the wire interception suppression motion, it was agreed by all counsel that we would also hear and determine the motion to suppress the Robinson conversations for use in the Government's case-in-chief since the consent determination hinged upon the same factual findings.[6] Fox, Foster, Barnes and all other defendants who were parties to a Robinson conversation were granted oral leave to interpose motions to suppress the Robinson conversations.

Hearing was thereupon commenced on the motions to suppress the Robinson conversations and the wire interception. In the midst of the hearing, the defendants discovered and then pressed their most serious objection to the wire interception—the absence from the Court's interception order of certain language, prescribed in Title III, requiring prompt execution of the interception and minimization of interception of communications not otherwise subject to interception. The issues raised by this problem required additional testimony. The total hearing consumed approximately five and one-half days. For reasons which will appear, the defendants' motions to suppress have been denied.[7]

## II.  *Constitutionality of Title III*

The constitutionality of the statutes *governing interception of oral and wire* communications was upheld, as against Fourth Amendment attack, in *United*

---

5.  Apparently, the defendants had already discovered his identity.

6.  Judge Hannum also agreed that we might hear and determine the motion to suppress the Robinson conversations.

7.  Prior to commencement of our suppression hearing, Judge Hannum had specially listed the case for trial on December 9, 1974. The first segment of our hearing concluded on December 5, 1974, and the final segment, the so-called "*Cirillo* hearing" (see discussion *infra*), did not conclude until mid-morning on December 6, 1974. In view of Judge Hannum's listing, it was impossible for us to delay our decision until we could prepare and file a written opinion. Accordingly, on the afternoon of December 6, 1974, we delivered a bench opinion and order dealing with most of the issues before us and on December 11, 1974, (Judge Hannum postponed the commencement of the trial), we issued a final order denying relief on all grounds, with the notation that an opinion would follow. In this opinion we have edited the bench opinion and have augmented it to set forth our reasons for the final order in areas not covered by the bench opinion. We also correct herein any misstatements in the bench opinion and in our brief remarks accompanying our final order. We have commented upon intervening decisions of the Court of Appeals where apposite.

*States v. Cafero,* 473 F.2d 489 (3d Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974).[8] We are bound by *Cafero* and, accordingly, the defendants' constitutional argument need not detain us further.

### III. *The Robinson Conversations*

#### A. *The Applicable Law*

18 U.S.C. § 2511(2)(c) provides

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

▬ Any doubt as to the admissibility of consensually monitored conversations was set to rest by the decision in *United States v. Santillo,* 507 F.2d 629 (3d Cir. 1975). *Accord, United States v. Armocida,* No. 74–1091, 515 F.2d 49 (3d Cir., 1975). While ·in *Santillo* (and *Armocida*) it was the agent who recorded his own conversation, whereas here

the agents recorded while Robinson spoke, we believe that the *Santillo* rationale, 507 F.2d at 632–635, extends to and controls the case at bar. To the extent that it does not, we elect to follow the impressive authority of the circuits which have examined post-*Katz*[9] factual situations in which an agent has monitored and/or recorded a conversation between a defendant and a consenting participant. Such cases more closely parallel the facts in *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) and *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed. 2d 134 (1957)[10] (and thus the case at bar), and hold that such interceptions do not violate the Fourth Amendment.[11] Accordingly, we hold that the constitutional rights of the defendants were not violated by the fact that their telephone conversations were monitored and recorded without their consent so long as the other participant to these conversations (Robinson) gave his prior voluntary consent to the interceptions. We turn next to the appropriate standard for measurement of consent.

8. *Accord, United States v. Whitaker,* 474 F. 2d 1246 (3d Cir. 1973). Other circuits have reached a similar conclusion. *See, e. g., United States v. O'Neill,* 497 F.2d 1020 (6th Cir. 1974) ; *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007 (1974) ; *United States v. Tortorello,* 480 F.2d 764 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) ; *United States v. Cox,* 462 F.2d 1293 (8th Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974) ; *United States v. Cox,* 449 F.2d 679 (10th Cir. 1971), *cert. denied,* 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

9. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

10. In *On Lee,* a former acquaintance, turned Government informer, engaged the petitioner in an incriminating conversation and simultaneously transmitted the discussion to a federal agent hiding a short distance away, 343 U.S. at 749–50, 72 S.Ct. 967. In *Rathbun,* police officers listened on a regularly used extension telephone at the request of one party to the call, 355 U.S. at 108, 78 S.Ct. 161. In neither case was the evidence suppressed.

While we recognize that the trespassory concepts prevailing at the time these cases were decided have since been discredited, it does not necessarily follow that the holdings themselves are no longer sound law. The continuing validity of *Rathbun* and *On Lee* remains a subject of active debate. Four Justices among the Supreme Court's current membership have indicated their belief that *Rathbun* and *On Lee* survive *Katz. See United States v. White,* 401 U.S. 745, 750–752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). Justices Brennan, Douglas and Marshall, on the other hand, contend that *Katz* implicitly overrules these cases. *See Id.* at 755–56 (Brennan, J., dissenting), at 758–60 (Douglas, J., dissenting) and at 795–96 (Marshall, J., dissenting).

11. *See United States v. Bonanno,* 487 F.2d 654 (2d Cir. 1973) ; *United States v. Dowdy,* 479 F.2d 213 (4th Cir.), *cert. denied,* 414 U. S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973) ; *Ansley v. Stynchcombe,* 480 F.2d 437 (5th Cir. 1973) ; *Holmes v. Burr,* 486 F.2d 55 (9th Cir.), *cert. denied,* 414 U.S. 1116, 94 S. Ct. 850, 38 L.Ed.2d 744 (1973) ; *United States v. Quintana,* 457 F.2d 874 (10th Cir.) *cert. denied,* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972).

In *United States v. Osser*, 483 F.2d 727 (3d Cir.), *cert. denied*, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 221 (1973), the Court held that consent to the tapping of a telephone conversation between an indicted defendant and a potential Government witness was sufficient to justify the admission of the tape at trial, although it was possible to infer from the circumstances of the witness' consent to the tapping that he hoped by cooperating with the Government not to disturb a forthcoming grant of immunity.[12] In discussing the witness' hopes for leniency, Judge Rosenn stated, "[o]ur inquiry on appeal is limited to whether the consent was voluntary and uncoerced, not whether the motivations for it were altruistic or self-seeking."[13] While *Osser* does not elucidate a comprehensive standard for measuring the validity of consent, it does indicate that so long as pressure is not initiated by the police for the purpose of overbearing the will of the "consenting" party, the authorization is valid.

Likewise, in *United States v. Bonanno*, 487 F.2d 654 (2d Cir. 1973), the Court of Appeals for the Second Circuit discussed the amount of proof required to show that an informer consented to the monitoring of a telephone call. Noting at the outset that the extent of proof required to show "consent" in such cases is quite different from that needed to show consent to a physical search, Judge Friendly stated that "it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about." 487 F.2d at 658–59.

One final consideration bearing upon the law applicable to the admissibility of consensually monitored conversations is the effect of the Pennsylvania statute, 18 C.P.S.A. § 5701–04, under which it has been held unlawful for third parties to record communications without the consent of all parties thereto. See *Commonwealth v. McCoy*, 442 Pa. 234, 275 A.2d 28 (1971); *Commonwealth v. Murray*, 423 Pa. 37, 223 A.2d 102 (1966). Assuming, *arguendo*, that the Robinson recordings were made in violation of Pennsylvania law, that would not, contrary to defendants' contentions, affect their admissibility in the case at bar. So long as the information was lawfully obtained under federal law, which is embodied in 18 U.S.C. §§ 2510–2520, it is admissible in federal court despite a violation of state law. *On Lee v. United States*, 343 U.S. 747, 754–55, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *United States v. Armocida*, No. 74–1091, 515 F.2d 49 (3d Cir. 1975).

---

12. Similar holdings are found in *United States v. Dowdy*, 479 F.2d 213 (4th Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973); *United States v. Silva*, 449 F.2d 145 (1st Cir. 1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 942, 30 L.Ed.2d 787 (1972); and *United States v. Jones*, 140 U.S.App.D.C. 70, 433 F.2d 1176 (1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed. 2d 120 (1971). These cases hold that a party's consent to recording and transcription of telephone conversations between that party and another is not rendered involuntary because the consent is given in return for a promise of immunity from prosecution.

13. 483 F.2d at 730. Also see *United States v. Zarkin*, 250 F.Supp. 728, 737 (D.C.D.C. 1966), where the Court stated:

We can think of no time in which a party to a telephone conversation would permit the police to intercept that conversation when he, himself, would not seek something from the police in return, assuming he is of sound mind and knows the police are police. He might merely be seeking police protection from threatening phone calls. Or, he might be an undercover policeman who seeks his pay check. Or, indeed, he may be seeking leniency. However, so long as pressure is not initiated by the police for the purpose of overbearing the will of the party, this Court does not believe that the authorization given by the party is involuntary.

## B. *Factual Findings* [14]

█ Charles "Mickey" Robinson is the "common law brother-in-law" of defendant James Fox. (Fox had been living with Robinson's sister, Tamara Robinson, for a number of years.) In March, 1974, Robinson visited the DEA offices in Philadelphia. Shortly thereafter, Robinson agreed to cooperate with DEA.[15] The program of cooperation involved a series of telephone calls made by Robinson in the presence of DEA agents which were monitored and recorded by them. During these telephone calls Robinson spoke with Fox, Barnes, Thornton, Foster and one Herschel Williams about narcotics traffic. Pursuant to the conversations, actual narcotics buys were made by Robinson from Williams, Thornton and Foster, who were Fox's associates.

During the suppression hearing, Robinson admitted antipathy toward Fox because of his belief that Fox had intimidated members of Robinson's family (particularly his mother). Robinson testified, however, that his desire to help DEA was motivated by two factors: (1) his concern for his family; and (2) his objection to the involvement of Fox and his associates in narcotics trafficking.[16]

Robinson further testified that when he came to DEA he did not ask for assistance in the form of money or help with any pending criminal cases. However, after he began cooperating with DEA by making the telephone calls, DEA offered and gave monetary assistance which Robinson accepted. (The first payment did not occur until after a number of calls had been completed.)

Indeed, ultimately DEA offered and provided subsistence to Robinson and, due to its concern for his safety, relocated him outside the Philadelphia area following the indictments. Robinson's testimony with respect to financial assistance was corroborated by DEA agents. Moreover, according to the testimony of Robinson and the DEA agents, the consent of Robinson to the monitoring and recording was sought and obtained (with one possible exception) prior to each monitored and recorded conversation. Most of the calls were monitored from the DEA office, and the agents testified that before each call they asked Robinson if it was all right to monitor and record it, and Robinson agreed. Several calls were monitored from Robinson's apartment in the presence of Agent Lucas, and it appears that the consent was obtained prior to the first call and may not have been recited prior to each call received in quick succession. However, by this time Robinson had consented on numerous occasions to the course of telephone calls and to the monitoring and recording of numerous individual calls.

There was no evidence that Robinson was threatened or taken advantage of or that he was under the influence of drugs; indeed, the evidence was completely to the contrary. It appears that Robinson did have one open criminal case in the Court of Common Pleas of Philadelphia, but he denied receiving any help from the Government in connection with that case and the DEA agents deny that they were asked for or offered help. Robinson also denied being a drug user and the DEA agents testified that they did not know Robinson to be a drug user.

14. Pursuant to our order, entered in response to a motion by the defendants, the Government produced the informant, Charles "Mickey" Robinson, at the hearing. Evidence on the issue of Robinson's alleged consent to the monitoring of his conversations was adduced from Robinson and from DEA agents O'Brien and Lucas, who were present when the calls were monitored.

15. Robinson testified that he came unsolicited to the DEA office, offering to help them control drug traffic which he considered to be a threat to young Blacks.

16. More particularly, Robinson felt that Fox was perverting several youth organizations, in which both men had been involved, by using them as a base for the narcotics trade.

The defendants were given broad leeway to cross-examine Robinson and the DEA agents on these issues. We credit the testimony of Robinson and the DEA agents as recited above.

### C. Conclusion

Having credited the testimony of Robinson and the DEA agents on the points at issue, we find that the Government has, by clear and convincing evidence, established to our satisfaction that Robinson voluntarily consented to the subject conversations. The evidence not only meets the test enunciated in *United States v. Bonanno, supra,* but it also meets the standard gleaned from *United States v. Osser, supra.* We thus conclude that the Robinson conversations should not be suppressed.

### IV. Probable Cause for the Wire Interception Order

With respect to probable cause, 18 U.S.C. § 2518(3) states that before an order authorizing or approving wire interception may be granted, the court must determine on the basis of the facts submitted by the applicant that:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; ·

\* \* \* \* \* \*

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The probable cause allegations of the affidavit submitted to us by Agent Miller and based upon which we issued our interception order were a function of a variety of investigative tools. Information concerning illicit narcotics activities of Mr. Fox was developed, in part, by DEA special agents while conducting an investigation of Black Incorporated, an organization of Negro males allegedly engaged in narcotic trafficking. Other information relative to Fox was supplied by DEA informants other than Robinson. However, the major component of the probable cause section of the affidavit emanated from the Robinson conversations adverted to above, the fruits of which were detailed in the affidavit.

On March 21, 1974, Robinson advised Special Agent Sherman Lucas that he had spoken with Fox and tentatively arranged to purchase a quantity of heroin. A subsequent telephone call was placed by Robinson from the DEA office to Fox's phone number (215–284–3840) and a conversation ensued between Robinson and Fox. The telephone conversation was monitored by Special Agent Lucas, with the consent of Robinson. Thereafter, over a period of approximately a month and a half, Robinson participated with DEA in making and receiving monitored calls to and from Fox, Williams, Thornton, Barnes and Foster, during which the sale of narcotics was discussed. The paragraphs of the affidavit which ˙recite the substance of the monitored calls are too lengthy to reproduce here. Suffice it to say that they discuss details of heroin trafficking involving Fox and his confederates. Moreover, the affidavit recites in detail that, pursuant to the monitored conversations and while under the surveillance of DEA agents, actual narcotic buys were made by Robinson from Williams, Thornton and Foster, all of whom the telephone calls indicated were Fox's associates in the narcotics enterprise. The description in the affidavit of the Robinson calls and follow-up narcotics buys covers some eleven pages.

In addition, the affidavit recites that surveillance of Fox by DEA agents in Upper Darby, Pennsylvania, established

that Fox resided at 250 Beverly Boulevard, Apartment F–208, Upper Darby, Pennsylvania, and that the telephone located there and commonly used by Fox bore the telephone number (215) 284–3840. Moreover, it was this phone number that Robinson called when he contacted Fox during the month and a half of monitored conversations.

■ Probable cause is by definition only the probability, and not a prima facie showing, of criminal activity, *Brinegar v. United States*, 338 U.S. 160, 172–76, 69 S.Ct. 1302, 1309–1311, 93 L.Ed. 1879 (1949); that is, facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information, which facts are sufficient in themselves "to warrant a man of reasonable caution in the belief" that an offense has been or is being committed by the putative defendant. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). We were satisfied when we entered the wire interception order, and remain satisfied, that there was sufficient probable cause to meet the statutory and constitutional requisites.[17] Testing the affidavit "in a commonsense and realistic fashion",[18] the conversations and other evidence set forth in it amply demonstrate that there was probable cause to believe that Messrs. Fox, Jefferson, Foster, Barnes, Williams and Thornton and "others as yet unknown" were participants in the scheme of distribution heroin and were utilizing the telephone located at Fox's premises to communicate with each other in furtherance of the scheme. While they attacked probable cause in their motion papers (requiring this section of the opinion), the defendants did not, in our view, seriously controvert probable cause at the hearing. Indeed, one of their claims was that the wire interception was unjustified because the Government had set forth sufficient evidence in the affidavit to arrest some of the defendants; this, in itself, seems to us to be a virtual concession of probable cause.[19]

17. No special probable cause requirement can be found in the statutory scheme of Title III. It is, therefore, reasonable to conclude that the probable cause required by 18 U.S.C. §§ 2510–2520 is the same as that which is necessary to obtain the issuance of a warrant for a physical search. *United States v. Falcone*, 505 F.2d 478 (3d Cir. 1974).

18. *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

19. Since the affidavit relies on an informant, defendants contend that it must also be tested by the standards of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and their progeny. *See, e. g., United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. McNally*, 473 F.2d 934 (3d Cir. 1973); *United States v. Singleton*, 439 F.2d 381 (3d Cir. 1971). Under *Aguilar*, an affidavit cannot support a probable cause determination based upon an informant's information unless it shows: (1) the underlying circumstances from which the informant reached his conclusions about illegal activity in a given area; and (2) the underlying circumstances from which the affiant concluded that the informant was credible or his information reliable. This two-pronged test must be applied by the magistrate to the informant's tip even if that tip is corroborated by independent sources. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). If the informant's report fails to pass the *Aguilar* test but is corroborated by independent sources, the magistrate must determine whether the independent corroboration added to the report makes it as trustworthy as a report which would satisfy both branches of *Aguilar*. *Spinelli v. United States, supra.*

Given the fact that the DEA agents listened in on Robinson's calls, we have our doubts as to the validity of the defendants' contention that the *Aguilar-Spinelli* line of cases is apposite, for the conversations themselves establish the bases for the informant's conclusions and demonstrate his reliability. *Accord, United States v. Staino*, 358 F.Supp. 852, 855 (E.D.Pa.1973). In any event, in view of the ample content of the Robinson calls, the standards imposed by *Aguilar* have clearly been met, and, to the extent that the tip was corroborated by independent evidence (i. e. the actual narcotics buys set up by the Robinson telephone calls), *Aguilar-Spinelli* standards have also been satisfied.

It is also possible to construe the Miller affidavit as one which must be tested under *Aguilar-Spinelli* standards because of the de-

## V. Alleged Misrepresentations in the Affidavit

The defendants argue that we should suppress the intercepted conversations because the affidavit supporting the Government's application contained material misrepresentations of fact. We have held that the affidavit in support of the wiretap application was sufficient on its face to establish probable cause. However, an order based upon an affidavit sufficient on its face may nonetheless be invalidated if the affidavit contains misrepresentations of fact. *United States v. Armocida,* Nos. 74–1090, 74–1146, 74–1253, 515 F.2d 29 (3d Cir., 1975).[20]

fendants' contention that, notwithstanding the tapes, only Robinson could identify Fox's voice. However, even if this is so, the Miller affidavit provided a sufficient basis for a finding of probable cause to meet the *Aguilar-Spinelli* test. First, there was independent evidence available to the Government that the number which Robinson called was registered to an address at which the DEA agents knew that Fox resided. This independent evidence was gathered by means of DEA surveillance of Fox and from the Bell Telephone Company of Pennsylvania records. Secondly, as mentioned, the narcotics buys from James Fox's associates following on the heels of and in response to the telephone calls wherein frequent allusions were made to "James" provide independent evidence of Robinson's reliability. As the affidavit also notes, the heroin buys were surveilled by Government agents. In sum, the information supporting the statements establishing probable cause in the affidavit has been shown to have been gained in a reliable manner.

20. To this date two standards have emerged in the circuits that have considered the issue of misrepresentation. (While the affidavit in this case was in support of an application for wire interception [instead of physical search], the issue of misrepresentation in the affidavit is the same in both areas). The standard set forth by the Seventh Circuit, *United States v. Carmichael,* 489 F.2d 983, 988–89 (7th Cir. 1973), and adopted by the Eighth Circuit, *United States v. Marihart,* 492 F.2d 897, 900 (8th Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974), is that a warrant based on an untruthful affidavit is invalid if (1) the government agent recklessly misrepresented a material fact; or (2) the government agent intentionally misrepresented a fact, whether or not material.

The Fifth Circuit's formulation of the rule, *United States v. Thomas,* 489 F.2d 664 (5th Cir. 1973), is slightly different from that announced in *Carmichael* and *Marihart.* Under the *Thomas* test, a warrant based on an affidavit is invalid if in the affidavit (1) the government agent intentionally misrepresented a fact, whether or not material; or (2) the government agent non-intentionally misrepresented a fact which was material to the establishment of probable cause. The

Fifth Circuit's formulation, unlike that employed by the Seventh and Eighth Circuits, would hold a warrant invalid if the underlying affidavit contained a negligent (but not necessarily reckless) misrepresentation that was material. Also see *United States v. Belculfine,* 508 F.2d 58, 61 (1st Cir. 1974), where the Court highlighted a second distinction; i. e. the Fifth Circuit explicitly requires that a non-material misrepresentation must have been made with an intent to deceive the magistrate if it is to vitiate the resulting warrant, whereas the Seventh Circuit's rule, according to Chief Judge Coffin, seems to contemplate no determination of whether the affiant intended to deceive the magistrate. The Third Circuit in *Armocida,* although it acknowledged the principle that misrepresentations may invalidate an affidavit, did not have to reach the question of which standard to apply.

A subsidiary problem in the area of misrepresentations contained in affidavits supportive of search warrants is the question of what initial showing a defendant must make before he is entitled, at a suppression hearing, to impeach a legally sufficient affidavit. This is an issue on which the Supreme Court has not passed. See *Rugendorf v. United States,* 376 U.S. 528, 531–32, 84 S.Ct. 825, 11 L.Ed. 2d 887 (1964); Kipperman, *Inaccurate Search Warrant Affidavits As a Ground for Suppressing Evidence,* 84 Harv.L.Rev. 825 (1971). There is a wide disparity of opinion on the issue among those state and federal courts that have considered it. Some courts have expressed the view that inquiry into the veracity of the facts presented in the affidavit should either never be permitted or should be allowed only upon a claim that the magistrate acted arbitrarily or capriciously. See, e. g., *State v. Sabari,* 109 Ariz. 553, 514 P.2d 474 (1973); *State v. Lamb,* 209 Kan. 453, 497 P.2d 275 (1972); *Liberto v. State,* 248 Ark. 350, 451 S.W.2d 464 (1970); *People v. Bak,* 45 Ill.2d 140, 258 N.E.2d 341, *cert. denied,* 400 U.S. 882, 91 S.Ct. 117, 27 L.Ed.2d 121 (1970). A number of states reach opposite results because of controlling statutes. See, e. g., *State v. Wright,* 266 Or. 163, 511 P.2d 1223, 1225–26 (1973); *State v. Bankhead,* 30 Utah 2d 135, 514 P.2d 800, 802 (1973). Still others allow an investigation into the truth of the facts on certain

■ Although broad leeway was given to defense counsel to attempt to discredit or contradict the affidavit submitted by DEA Agent Miller in support of the application for wire interception, we find, after several days of testimony, no evidence of intentional misrepresentation or intent to deceive on the part of the DEA agents. Moreover, we find not a single material contradiction to the affidavit or evidence discrediting it; hence, the affidavit cannot be invalidated for alleged misrepresentations.[21]

conditions. *See, e. g., State v. Boyd*, 224 N. W.2d 609 (Iowa 1974) (must make sworn preliminary showing that a state official or agent has intentionally made false statements or otherwise practiced fraud upon the magistrate or that a material statement by such official or agent is simply false). Several circuits have indicated that such a hearing should be held "when there has been an *initial showing* of falsehood or other imposition on the magistrate." *United States v. Dunnings*, 425 F.2d 836, 840 (2d Cir. 1969) (emphasis added); *United States v. Rael*, 467 F.2d 333 (10th Cir. 1972). In *United States v. Carmichael*, 489 F.2d 983, 988 (7th Cir. 1973), the Seventh Circuit ruled that a defendant is entitled to a hearing to challenge a facially sufficient affidavit when an *initial showing* is made either of "(1) any misrepresentation by the government agent of a material fact; or (2) an intentional misrepresentation by the government agent, whether or not material." At the other end of the spectrum (i. e. conferring more leeway upon defendants) are decisions such as *United States v. Scott*, 331 F.Supp. 233 (D.D.C. 1971) and *Commonwealth v. Hall*, 451 Pa. 201, 302 A.2d 342 (1973) both of which imply that no initial showing need be made before a defendant may attempt to impeach or discredit the facts contained in the affidavit. Law review writers have not neglected this subject either. *See, e. g.*, Mascolo, *Impeaching the Credibility of Affidavits for Search Warrants: Piercing the Presumption of Validity*, 44 Conn.B.J. 9, 18–20 (1970); Note, *Search Warrant Affidavits: The Constitutional Constraints*. 23 Drake L.Rev. 623, 635–36 (1974); Comment, *The Outwardly Sufficient Search Warrant Affidavit: What If It's False?*, 19 U.C.L.A.L.Rev. 96 (1971). *See also* Pulaski, *Authorizing Wiretap Applications Under Title III: Another Dissent to Giordano and Chavez*, 123 U.Pa.L. Rev. 750, 795–798 (1975). In *United States v. Armocida, supra*, the Third Circuit discussed this problem, but found it unnecessary to decide which standard applied.

There are, doubtless, cases in which the defendants can adduce independent evidence of misrepresentations in an affidavit so as to meet the requirements of the tests enunciated in *Dunnings* and *Carmichael*. Defense counsel here argued that it was unusually difficult, if not impossible, for them to determine whether there were such misrepresentations.

Accordingly, they sought leave in this case to cross-examine affiant Miller and other DEA agents with respect to each paragraph of the affidavit in an attempt to controvert it. Although we noted during the suppression hearing our belief that the *Carmichael* case states the better rule, out of an excess of caution we permitted broader leeway, conferring upon the defendants the right to attempt to impeach the affidavit even without an initial showing of falsity. However, from time to time, when the examination became redundant or went far afield, we disallowed it. Although we believe that we allowed defendants ample leeway, thus rendering unnecessary a decision on the issue, to the extent that they may still contend that we did not, we would adopt the *Carmichael* rule which undercuts defendants' position because at no time did they make any initial showing of falsity.

21. It is necessary to make particular note of only one area. Defense counsel sought to discredit the allegation in the wire interception application that no other application was known to have been made to any judge for authorization to intercept or for approval of interception of wire or oral communications involving those persons, facilities or places named in the affidavit. Such statement is required to be included in every application for an order authorizing the interception of communications under 18 U.S.C. § 2518(1) (e). Agent Miller testified that he had checked the records of the Philadelphia DEA office and found no prior application. He conceded that neither he nor the other agents had checked with "Washington", but neither was there evidence that there is any central file in Washington in this regard. We inquired of counsel for the defendants as to whether any of their clients had ever received notice of prior wire interception or a copy of an inventory relating thereto such as is required by Title III when an interception has been made. An affirmative answer might have demonstrated falsity of the affidavit. However, defense counsel replied that they knew of none.

In the case of *United States v. Bellosi*, 163 U.S.App.D.C. 273, 501 F.2d 833 (1974), a wiretap was suppressed because there was evidence that the Government failed to disclose in its application the undoubted fact that one of the persons under investigation had been the subject of a previous wiretap

## VI. *Validity of the Attorney General's Authorization*

18 U.S.C. § 2516(1) provides that application for an order authorizing wire interception may validly be authorized only by the Attorney General of the United States or a designated Assistant Attorney General. In this case, the authorization for application bore the signature "William Saxbe". Against the background of the line of cases culminating in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the defendants questioned the authenticity of the authorization, although they conceded that they had no evidence upon which to form a belief that it was not Attorney General Saxbe who had, in fact, authorized the wire interception. In view of the question thus raised, we requested that the Government furnish an affidavit on the subject. The Government thereupon supplied the affidavit of Sol Lindenbaum, executive assistant to Attorney General Saxbe, certifying that the authorization was, in fact, given by Attorney General Saxbe on May 13, 1974. The Lindenbaum affidavit also established familiarity with Attorney General Saxbe's signature, and we are satisfied that the authorization was actually executed by Attorney General Saxbe. The *Giordano* line of cases is, therefore, inapposite here.

## VII. *Availability of Other Investigative Means*

18 U.S.C. § 2518(1)(c) requires that each application for an order authorizing the interception of a wire or oral communication shall include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Likewise, 18 U.S.C. § 2518(3)(c) requires that before authorizing an interception of communications, a judge must determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The defendants contend that the order authorizing the wiretap should not have been issued because our finding of ineffectiveness of using other investigative procedures was not supported. Paragraph 35 of the affidavit reads as follows:

The interception of said communications is necessary to this investigation for the following reasons:

(a) Confidential informants and witness described herein have no knowledge as to James FOX'S source of supply.

(b) Without this knowledge it would be exceeding difficult to prove the extent and volume of the narcotic activities on the part of the above-mentioned individuals and their associates in this criminal enterprise.

(c) There are no known witnesses who could be relied upon to testify to the relationship of FOX with his superiors and source of supply.

(d) Affiant believes that stationary surveillance on subject's premises for any substantial length of time would jeopardize this investigation. Moreover, even if effective surveillance was possible it would not provide any direct evidence of violation of Title 21, United States Code, Section 841(a)(1) since the illegal activity is occurring inside these premises by use of the aforementioned telephones.

(e) The infiltration of the above individuals by a Special Agent is not a practical possibility since these persons do not hire persons who are unknown in the narcotics field.

(f) Due to the manner in which the violations are carried out, the

---

authorization. *Bellosi*, however, is inapposite here because there is no evidence of a prior interception of any of the defendants or subjects named in the application or affidavit.

We are, therefore, satisfied that Agent Miller's affidavit is sufficient and uncontradicted on this score.

interception of these communications appears to be the only available method of investigation which has a reasonable likelihood of securing the evidence necessary to prove the commission of these violations by FOX's superiors and source of supply.

██ It is apparent that 18 U.S.C. 2518(1)(c) and (3)(c) do not require that any other investigative procedure be tried first before an order is issued for the interception of communications. Moreover, it is not required that a wiretap be utilized as a last resort. *Accord, United States v. Staino,* 358 F.Supp. 852 (E.D.Pa.1973); *United States v. Whitaker,* 343 F.Supp. 358 (E.D.Pa.1972), *rev'd on other grounds,* 474 F.2d 1246 (3d Cir. 1973). To support a finding that normal investigative procedures are unlikely to be successful, the Third Circuit Court of Appeals has interpreted the congressional directives as "only requiring that there exist a factual predicate in the affidavit." *United States v. Armocida,* Nos. 74–1090, 74–1146, 74–1253, 515 F.2d 29 (3d Cir., 1975). Furthermore, the legislative history would seem to substantiate such a view:

> Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous. . . . The judgment would involve a consideration of all the facts and circumstances. . . . Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. *See Giancana v. United States,* 352 F.2d 921 (7th [Cir.]), *certiorari denied,* 382 U.S.

959, 86 S.Ct. 437 [15 L.Ed.2d 362] (1965); *New York v. Saperstein,* 2 N.Y.2d 210 [159 N.Y.S.2d 160], 140 N.E. 2d 252 (1957). What the provision envisions is that the showing be tested in a practical and commonsense fashion. Compare *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741 [13 L.Ed.2d 684] (1965).

S.Rep.No.1097, 90th Cong., 2d Sess., 1968, U.S.Code Cong. & Admin.News, pp. 2112, 2190.

██ The burden on the Government under § 2518 is not a great one, *United States v. Staino, supra; United States v. Whitaker, supra.* As stated in Title III, the Government need not prove that normal investigative techniques will not prevail, but rather need only show that such techniques "reasonably appear unlikely to succeed if tried." *United States v. Armocida,* Nos. 74–1090, 74–1146, 74–1253, 515 F.2d 29 (3d Cir., 1975). *Cf. Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). By this standard, the Miller affidavit is clearly sufficient to support the finding made by this Court in accordance with 18 U.S.C. § 2518(3)(c).[22]

██ The defendants also argue that according to the affidavit sufficient evidence existed prior to the wiretap application to arrest at least some of the defendants for violations of 21 U.S.C. §§ 841 and 846. Although it is likely that probable cause existed for the arrests of some defendants, we do not believe that this fact inveighs against the viability of the wire interception. The object of the wire interception was expressly stated to be the determination of the source of heroin supply. The Government is entitled to seek to

---

22. We also note that although the defendants sought to uncover misrepresentations in the affidavit on the subject of other investigative means, they were unsuccessful in doing so. The defendants cross-examined DEA Agents O'Brien and Miller at length on this subject. While the agents conceded that undercover infiltration was a useful investigative tool, they testified that it was impossible to effect such an infiltration in this case since the defendants would only deal with persons known to

them. The only reason that the defendants dealt with Robinson was that he was Fox's "brother-in-law", yet Robinson could not get them to divulge the source of supply. O'Brien and Miller conceded that they had been successful in infiltrating Fox's network through informants other than Robinson to the degree of making contact with certain peripheral figures in the network, but again that does not controvert the salient allegations of the affidavit.

determine the extent of a heroin network or source of supply and is not obliged to conclude its investigation because it obtains certain minimal or threshold evidence of a defendant's culpability. As the Court recently stated in *United States v. Armocida,* Nos. 74–1090, 74–1146, 74–1253, 515 F.2d 29 (3d Cir., 1975) when discussing this issue:

> When the wiretap application was made, the government's objective was to ascertain the scope of the alleged narcotics conspiracy and to identify the participants. . . . Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned.

In sum, we are convinced that the showing in the Miller affidavit was more than sufficient to establish that other investigative means were not reasonably available to meet the legitimate aims of the DEA investigation.

## VII. *Absence from the Order Authorizing Interception of a Provision Requiring Execution as soon as Practicable and Minimization*

### A. *Introduction*

18 U.S.C. § 2518(5) provides in pertinent part:

Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

■ There is no doubt that the provision required by this section was (inadvertently) omitted from the Court's wire interception order (although its absence was not noted by anyone until the suppression hearing was well under way).[23] Defendants contend that this omission, however inadvertent, vitiates the order and requires suppression of its fruits regardless of whether (1) the wiretap was executed as soon as practicable; and (2) the interception was actually conducted in such a way as to minimize listening to communications not otherwise subject to interception under Title III.[24] As authority in support of their position, defendants advance the cases of *Johnson v. State,* 226 Ga. 805, 177 S.E.2d 699 (1970); *Cross v. State,* 225 Ga. 760, 171 S.E.2d 507 (1969); *State v. Lee,* 16 Md.App. 296, 295 A.2d 812 (1972), and *State v. Siegel,* 266 Md. 256, 292 A.2d 86 (Md.Ct.App. 1972).

In *State v. Siegel,* the Court of Appeals of Maryland held that a judicial wire interception order pursuant to Title III, which failed to include the above-quoted language required by § 2518(5), was invalid. Moreover, stated the Court, such invalidity was not cured by statements in renewal orders that

---

23. In wire interception applications, just as in the case of all other types of motions, the practice in our Court is for counsel to submit to the judge the motion together with a form of order for the judge's signature. That was done here. The minimization provision has become virtual boilerplate. Mr. McKeon, the government attorney, so acknowledged and proffered by way of explanation for the omission the probability that in typing and re-typing the order a secretary inadvertently deleted the minimization language. When the application was submitted to us, we spent over an hour reviewing the affidavit. After we satisfied ourselves as to the sufficiency of the affidavit, we reviewed the order, which seemed appropriate; hence, we signed it. We did not check the order against the text of Title III. Had we done so the omission would have been caught, but we assumed that the order was in proper form.

24. The defendants also moved to suppress the wire interception on the grounds that the Government failed to minimize, but that matter was heard, following the conclusion of our hearing, by Judge Hannum as the trial judge in light of the provisions of Local Cr. Rule 16(b), *supra.*

the Court was satisfied that the provisions of the order would be conducted as soon as practicable and in such way as to minimize interception of communications not otherwise subject to interception. In *Siegel,* the prosecution argued that the absence of such provisions from the order should not make it void so long as the authorizing court scrutinizes the manner in which the surveillance was actually conducted and finds it satisfactory to meet the statutory standards of Title III. Rejecting this rationale and refusing to abide any deviation from the strict statutory procedure set up in Title III, the Maryland Court relied on *Cross v. State* [25] and *Johnson v. State* [26] to hold that the evidence derived from the wiretaps based on the defective order must be suppressed.

Countering the defendants' position, the Government contends here that the omission of the relevant language in the order should not be the basis for the suppression of the intercepted communications. It urges us to follow *United States v. Cirillo,* 499 F.2d 872 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974), and *People v. Solomon,* 74 Misc.2d 926, 346 N.Y.S. 2d 938 (N.Y.1973). In *People v. Solomon* the Court discussed the omission from the wire interception order of the minimization provision of New York Criminal Procedure Law § 700.30(7) and 18 U.S.C. § 2518(5).[27] There it was held that the absence in the wiretap order of the directive to minimize was "unquestionably de minimis" and that the omission did not vitiate the order.[28] The Court's rationale was based upon (1) compliance with § 700.30 (1–6) of the New York Criminal Procedure Law, which it deemed the functional equivalent of recitation of the

25. In *Cross v. State,* 225 Ga. 760, 171 S.E. 2d 507 (1969), the Supreme Court of Georgia held that an order authorizing the tapping of the telephone lines of one of the defendants failed to comply with the requirements of Title III, in that it failed to include provisions regarding execution as soon as practicable, termination upon attainment of the authorized objective and minimization. This deficiency, held the Court, rendered the recordings of the telephone conversations obtained pursuant to the order inadmissible in evidence. In discussing their rationale for suppressing evidence obtained pursuant to the defective order, the Georgia Court stated:

It cannot be questioned that the defendants were aggrieved by the failure of the warrant to contain such a restriction upon the interception of communications over the telephone lines of the defendant, William H. Cross. The transcript of the evidence shows that considerable portions of the tapes introduced in evidence recorded conversations which were totally irrelevant to any question relating to gambling. The fact that the court did not permit such irrelevant portions to be played to the jury did not alter the fact that under the warrant the investigating officers were permitted to conduct a general and wide ranging search through all of the telephone conversations conducted on the telephone lines in question during a period covering approximately 20 days and to seize and record matters in no way related to the crime which they were investigating. Such a search constituted a violation of the defend-

ants' right to privacy guaranteed to them under the terms of the Fourth Amendment of the United States Constitution, and by Art. I, Sec. I, Par. XVI of the Constitution of this State.

171 S.E.2d at 511–12.

26. In *Johnson v. State,* 226 Ga. 805, 177 S.E. 2d 699 (1970), the Supreme Court of Georgia followed the decision in *Cross* and again held that where an order authorizing wiretapping failed to include a statement as to execution as soon as practicable, termination upon attainment of the authorized objective and minimization, such order was invalid and recordings obtained pursuant thereto were inadmissible. The *Johnson* decision differs from that in *Cross,* however, in that the Court in *Cross* seems to have indicated that there was no *actual* compliance with the minimization requirements by the government agents. *Johnson* does not discuss this factor and appears to base a holding of suppression merely on a requirement of strict compliance with § 2518 (5).

27. The relevant portions of New York Criminal Procedure Law § 700.30(7) and 18 U.S.C. § 2518(5) are, for all practical purposes, identical.

28. New York state judges have construed this requirement in different ways. *See, e. g., People v. Kennedy,* 75 Misc.2d 10, 347 N.Y.S. 2d 327 (Greene Cty.Ct.1973), where Judge Werken held that a wiretap order was fatally defective for failure to comply with the 700.30 requirement.

minimization requirement;[29] (2) case law guidelines dealing with the "common sense" interpretation that should be accorded search warrants, see, e. g., *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); and (3) the presence of the minimization directive in the extension order, giving credence to the assertion that its absence in the initial order was a mere oversight.

Similarly, in *United States v. Cirillo*, the Second Circuit Court of Appeals was presented with the question of whether an omission of the minimization directive required by New York Criminal Procedure Law § 700.30(7) in a warrant order authorizing a wiretap rendered the order fatally defective. In *Cirillo*, Judge Mansfield held that such omission did not vitiate the order and require suppression of its fruits if there was "other convincing evidence that the officers conducting the wiretap were aware of the minimization requirement and abided by it". 499 F.2d at 879. Citing *People v. Solomon*, and approving the rationale of that decision, Judge Mansfield then proceeded to conduct the Court's inquiry into the record relating to the awareness of agents of the minimization requirement and the extent of their compliance with it.

The Cirillo investigation had been conducted jointly by the District Attorney for Kings County and the Federal Bureau of Narcotics and Dangerous Drugs (BNDD). Agents who supervised the investigation for each office submitted affidavits stating that they were aware of the minimization requirement before the first Cirillo warrant was obtained, and that minimization instructions were given to the officers and agents conducting the tap, who were ordered to turn off all recording and listening devices whenever they were able to determine that nonpertinent conversations were being intercepted. The supervising agent for BNDD visited the Cirillo wiretap almost daily from its inception and personally observed agents and officers complying with these instructions. Furthermore, the Court found that during the period covered by the first warrant, the listening and recording of over a quarter of the completed calls was terminated as soon as nonpertinency was determined.[30] Determining that the affidavits disclosed in detail a clear awareness of and adherence to the minimization requirement, the *Cirillo* Court concluded that despite the technical defect, the statute was substantially complied with.[31]

As noted above, the hearing on the question of actual minimization was

---

29. CPL 700.30(1–6) deals with the insertion of provisions detailing such things as (1) the identity of the person, if known, whose communications are to be intercepted; (2) the nature and location of the communication facilities as to which authority to intercept is granted; (3) a description of the type of communications sought to be intercepted; (4) the type of crime; (5) the identity of the law enforcement agency authorized to intercept the communications; and (6) the duration of the warrant's vitality, etc. The section is thus similar to 18 U.S.C. § 2518(4). The *Solomon* Court concluded that the insertion of these kinds of provisions added up to sufficient direction to law enforcement officers as to how unreasonable listening would be minimized. Thus, the Court concluded that the phrase couched in CPL § 700.30(7) dealing with minimization was simply a summation of the more specific demands enun-

ciated in subdivisions (1–6) of CPL, section 700.30.

30. The affidavit stated that "[o]f 496 telephone calls made or received, 120 were incomplete (no answer, busy or wrong number). Approximately 287 were listened to completely and approximately 93 were listened to only initially and then turned off when it was determined that they were non-pertinent.

31. The Court in *Cirillo* also found support for this holding in *United States v. Manfredi*, 488 F.2d 588 (2d Cir. 1973). In *Manfredi*, the Court held that the failure of original and renewal orders for wiretaps to contain directives to minimize did not invalidate the orders where supporting affidavits contained an agreement by the prosecuting authorities to limit the seizure of conversations to those specifically pertaining to the violation being investigated. *Cf. United States v. Rizzo*, 492 F.2d 443 (2d Cir. 1974); *United States v. Poeta*, 455 F.2d 117 (2d Cir. 1972).

scheduled to come before Judge Hannum at the conclusion of our supression hearing. When the absence of the minimization provisions from the wire interception order was called to our attention, we at once researched the point. Because we were, at that juncture, impressed with the reasoning of the *Cirillo* case and were desirous of deciding the suppression motion on the fullest possible record, we conducted what we denominated a *"Cirillo* hearing". The essence of the hearing was that it permitted the Government to develop (and the defendants to attack by way of cross-examination) evidence of: (1) the awareness of the DEA agents conducting the wire interception at the time of the entry of the interception order, of the minimization requirement of Title III; (2) the initial instructions to the agents (upon entry of the order) as to how to minimize; and (3) the actual procedures followed during the course of the wire interception with respect to achieving minimization of the interception of communications not otherwise subject to interception under Title III. The *"Cirillo* hearing" was not conducted as an actual minimization hearing, which was required by Local Criminal Rule 16(b) to be held by Judge Hannum. However, since time was of the essence, we instructed the Government to order daily transcript of the minimization hearing before Judge Hannum so that we could read it as it was delivered. Consonant with our reading of *Cirillo*, which considered the question of actual minimization in addition to other things, we announced at the commencement of the *"Cirillo* hearing" that we would accept such findings as Judge Hannum might make on the subject of good faith efforts to achieve minimization and the success of those efforts. At the conclusion of the proceedings before us, we not only read the daily transcript of the minimization hearing and reviewed Judge Hannum's findings but also made an independent consideration of the record and announced our findings, which are described below.

## B. Findings of Fact

The *"Cirillo* hearing" revealed that, totally without regard to our order, the DEA agents who had been designated to conduct the wire interception were acutely aware of the minimization requirement. Indeed, Agent O'Brien, who was in charge, testified that on the morning prior to presentation of the application for wire interception to this Court, and in anticipation that the Court would approve it, a meeting was held at DEA headquarters during which the agents (approximately ten in number) who were to participate in the interception were instructed as to minimization procedure. According to O'Brien, the agents were instructed to terminate all conversations between: (1) an attorney and client; (2) a physician and patient; and (3) a clergyman and communicant. They were also instructed to terminate any "nonpertinent" conversations. In O'Brien's view, these general guidelines permitted an agent to listen until such time as he could be satisfied of nonpertinency and, in the attorney-client situation, that there was in fact an attorney-client relationship between the attorney and the other party.

O'Brien testified that, in aid of minimization and as a precautionary measure, a large chart was prepared and placed over the monitoring equipment in plain view of the monitoring officers. The chart, which was received in evidence, was approximately three feet by three feet in size. There was one word, "MINIMIZATION", on the top of the chart, written roughly three inches high and an inch and a half wide. The remaining lettering on the poster was approximately one inch high. Agent O'Brien read into the record the text of the poster:

> Title III Re: D1-74-0057, James Fox et al.

> You will not listen to calls between: attorney, doctor, confessor and subject or subjects = privileged communication.

> Note: Upon determination that call falls in the above categories or is a

call of nonpertinent nature you will immediately disconnect intercept in accordance with minimization requirements. You will note on respective log sheets that conversation has been disconnected and for what reason (nonpertinent or privileged communication).

In addition, according to O'Brien,, a second chart was prepared to aid rapid termination of nonpertinent conversations. That chart was headed with the following language:

The following calls in all probability are nonpertinent based upon the initial call:

During the course of the interception, the agents noted in the chart that all calls from Tammy to Joyce (and vice-versa) and from Tammy to Mom (and vice-versa) were probably nonpertinent.[32] The testimony of Agent O'Brien was corroborated in toto by Agents Miller, DiStefano and Lobosco, who also participated in the interception and who were present at the instructional meeting.

Much of the cross-examination during the *Cirillo* hearing was directed to the guidelines for determining when an attorney-client relationship was established. In general, the agents testified that where it appeared that a client was seeking legal advice, or that a lawyer was representing the other party to the conversation in connection with a pending case, the relationship was established and the monitoring of that call was to be terminated. The agents conceded that there were no comprehensive objective criteria as to when the attorney-client relationship was established, and that they applied "common sense". The agents also testified that they felt that they need not terminate any conversation relating to criminal activity, whether or not related to narcotics.[33]

The testimony, particularly during cross-examination, developed that almost all of the participating agents had been employed in prior interceptions and were aware of the minimization requirement and procedure before the instant case. Indeed, the agents testified that they had never relied on the terms of the court order (few of the agents had ever read one) but rather on their agency instructions. We credit the testimony of Agent O'Brien and his fellow agents who testified during the *"Cirillo* hearing". We find that all of the agents who participated in the wire interception were properly instructed on minimization even prior to the entry of our wire interception order, that they were aware of the minimization requirement throughout, and, furthermore, that the large minimization chart at the listening post assured such awareness.

We note also that in each of the five, ten and fifteen day reports submitted to us pursuant to our original order and as a condition of continuance of the interception, Mr. McKeon, the Government attorney, after reciting the number of times that the subject telephone was

32. "Tammy" refers to Tamara Robinson, Charles "Mickey" Robinson's sister and Fox's paramour. The second chart was destroyed after the twenty day interception was concluded and was not received in evidence.

33. On this point, we note the statement of the Third Circuit Court of Appeals in *United States v. Armocida*, Nos. 74–1090, 74–1146, 74–1253, 515 F.2d 29 (3d Cir., 1975). In that case, one of the defendants (Conti) argued that all conversations involving gambling transactions should have been terminated as such calls were not listed in the authorizing order. Failure to terminate these calls, argued Conti, constituted failure to minimize. In response to this contention, Judge Garth stated that the District Court properly denied suppression of the wiretap evidence. Refusing to decide whether the conversations relating to gambling were "innocent" within the context of minimization for a narcotics-directed wiretap, the Court was nevertheless satisfied, under the circumstances in that case, that the interception of gambling conversations did not infect the otherwise reasonable character of the interception. Judge Hannum was similarly satisfied that such was the case here, as are we. *Cf. United States v. Rizzo*, 492 F.2d 443 (2d Cir.), *cert. denied*, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed. 2d 665 (1974) ; *United States v. Cox*, 462 F. 2d 1293, 1301 (8th Cir. 1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

utilized, related that the majority of the calls were of a personal nature and that interception was terminated. This is further evidence of awareness of (and compliance with) the minimization requirements during the interception.

At the conclusion of the actual minimization hearing, Judge Hannum made the following findings:

1. there was a good faith effort to achieve minimization by the government agents

2. there was minimization as required by 18 U.S.C. § 2518(5).

As indicated above, we read and independently considered the daily transcript of the *minimization hearing.* As a result, we concur in Judge Hannum's findings.[34] In the wake of our own findings following our *"Cirillo* hearing" and our concurrence in those of Judge Hannum following the minimization hearing, this case is in the same posture as *Cirillo:* (1) language equivalent to New York Crim.Proc.Law § 700.30 (1–6) was contained in the order (see *discussion, infra)* ; (2) the monitoring agents were aware of the minimization requirement

prior to commencement of the interception and took steps to insure consistent minimization; and (3) there was actual and good faith minimization. Accordingly, if *Cirillo* was correctly decided, we should deny the motion to suppress.[35] While we believe that *Cirillo* was correctly decided, we cannot end our discussion here. Instead, we must proceed to a more detailed analysis of Title III and of the relevant caselaw.

### C. *Discussion*

Defendants' contention that the absence of the language required by 18 U.S.C. § 2518(5) mandates suppression rests upon 18 U.S.C. § 2515 and 18 U.S.C. § 2518(10)(a). 18 U.S.C. § 2515 provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State,

---

34. The monitoring agents testified that, according to their logs, there were 497 times that the receiver was lifted from the cradle. The defendants challenged approximately 30 of these as examples of non-minimization on the part of the listening agents. As noted above, Judge Hannum found that there was both adequate minimization to fulfill the statutory requisites of 18 U.S.C. § 2518(5) and a good faith attempt to minimize. We agree with this finding under the standard of reasonableness on a case by case basis which is the test employed by this circuit. *See United States v. Armocida,* Nos. 74–1090, 74–1146, 74–1253, 515 F.2d 29 (3d Cir., 1975). Thus, we conclude that under the circumstances here the intercept procedures were conducted so as to reduce to the smallest practicable number the interception of nonpertinent calls.

35. During the course of the *Cirillo* hearing we also gave the Government the opportunity to offer evidence on the question of the execution of the interception "as soon as practicable", since that language was also omitted from the order. The Government thereupon offered evidence based upon which we find that the instructions given to the agents prior to the entry of our order, and the usual prac-

tices followed in these cases, were for the agents, immediately upon entry of the order authorizing interception, to commence the interception as soon as possible. (This involved going first to the telephone company and presenting a copy of the Court's order, obtaining advice as to the whereabouts of the contact points and connecting the electronic interception equipment.) We find that the interception was, in fact, executed as soon as practicable. The DEA agents went to the telephone company immediately upon execution of our order. There ensued an overnight delay because of the unavailability of certain Bell Telephone personnel and the difficulty which DEA Agent David Raub had in locating the correct contact points. Actual interception commenced on the morning of May 16, 1974, some seventeen and one-half hours after the entry of our order. We add only that the DEA agents were aware of the requirement that the intercept be executed as soon as practicable; indeed, they believed that the twenty day period which we allotted for interception began to run from the time of the order, rather than from the time that the tap was applied as provided in Title III. Accordingly, they were not about to lose what might have been valuable time.

or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

What disclosures are in violation of Title III, and are subject to motions to suppress, is in turn governed by § 2518 (10)(a), which states:

(10)(a) Any aggrieved person in any trial, hearing, proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

■ The defendants concede the inapplicability of subsections (i) and (iii);[36] hence, the Supreme Court's pronouncements in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) and *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) are inapposite.[37] However, they argue that the order must

36. § 2518(10)(a)(iii) deals with the technique of execution, rather than the actual validity of the order itself which is the point at issue in the case.

37. In *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) improper authorization by the Attorney General's executive assistant, in violation of 18 U.S.C. § 2516(1), was held to render the interception unlawful and subject to suppression under § 2518(10)(a)(i). The *Giordano* Court noted that Congress had sought to limit the use of electronic surveillance in Title III by restricting the power to authorize applications for wiretaps to a small, politically responsive group of senior Justice Department officials. Violations of this significant provision of § 2516(1) were, therefore, sufficient to render the interception unlawful. In discussing what violations of Title III render suppression available under § 2518(10)(a)(i), the Court in *Giordano* recognized that that section does not apply to every technical deficiency. On the other hand, stated the Court, the "unlawfully intercepted communication" language of § 2518(10)(a)(i) does not mean only those intercepted in violation of constitutional requirements. Only "where there is a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," 416 U.S. at 527, 94 S.Ct. at 1832, is suppression required under § 2518(10)(a)(i).

The sister case to *Giordano* is *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). In *Chavez*, the Supreme Court held that where the Attorney General had, in fact, authorized a wiretap application, the fact that the application and court order incorrectly identified the Assistant Attorney General as the authorizing official (a violation of the identification requirements of § 2518(1)(a) and § 2518(4) (d)) did not require that evidence obtained pursuant to the order be suppressed. *Giordano* was distinguished because failure to correctly *identify* the authorizing party, when in fact the authorizing party was one whom the statute comprehended having such authority, was viewed as not representing "a similar failure to follow Title III's precautions against the unwarranted use of wiretapping or electronic surveillance . . . ." 416 U.S. at 571, 94 S.Ct. at 1854. The *Chavez* Court held that because the purpose of §§ 2518(1)(a) and 2518(4)(d) (the identification sections) was merely to fix responsibility, they did "not establish a substantive role to be played in the regulatory system." 416 U.S. at 578, 94 S.Ct. at 1857. As such, the violation was technical and the interception was not unlawful and suppressible under § 2518(10)(a)(i). In this regard, the Court stated:

Though we rejected, in *Giordano*, the Government's claim that Congress intended "unlawfully intercepted" communications to mean only those intercepted in violation of constitutional requirements, we did not go so far as to suggest that every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications "unlawful."

416 U.S. at 574, 94 S.Ct. at 1856.

Moreover, the *Chavez* Court found that the authorization order was sufficient on its face under § 2518(10)(a)(ii) since the signatory, Assistant Attorney General Will Wilson, could have been designated specially to authorize under § 2516(1).

Although the defendants have conceded the inapplicability of subsection (i) rendering

be suppressed as "insufficient on its face" under § 2518 (10)(a)(ii), and they construe subsection (ii) to mean that any noteworthy deficiency in the order is sufficient to warrant suppression under that subsection.

In *United States v. Acon,* 513 F.2d 513 (3d Cir. 1975), our Court of Appeals had occasion to deal with the issue of the extent to which wiretap orders deficient on their face warrant suppression under § 2518(10)(a)(ii). The question in *Acon* was whether wiretap applications signed by an acting assistant attorney general, not specially qualified to approve electronic surveillance under 18 U.S.C. § 2516(1) must be suppressed as facially insufficient under § 2518(10)(a)(ii). At the suppression hearing, the Government presented, *inter alia,* an affidavit [38] from former Attorney General John Mitchell stating that although the authorization order was signed by Henry Petersen,[39] Mitchell had in fact given authorization.[40] The District Court suppressed the evidence derived from the wire interception on the ground that the order was facially insufficient under 2518(10)(a)(ii). The Court of Appeals reversed and held that because

suppression necessary in the case of an unlawfully intercepted communication, we have independently reviewed the issue and are satisfied that the communications were not unlawfully intercepted here. Although it is plain that the requirement of minimization has deep constitutional roots, *see, e. g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed. 2d 1040 (1967), we do not believe, in view of the particularity required by § 2518(4) (and complied with in our order) regarding the scope of the permissible intrusion, and in view of the procedures available for measuring whether minimization was actually effected (see discussion, on both points, *infra*), that the absence of the § 2518(5) language from the order resulted in the deprivation of a constitutional right. The provision requiring execution as soon as practicable, likewise, has constitutional underpinnings. The purpose of requiring prompt execution is to prevent the probable cause showing in the application from becoming stale. *See, e. g., Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) ; *Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L. Ed. 260 (1932). However, as with the minimization requirement, we do not believe that the absence of a directive in the order to promptly execute rises to a constitutional violation.

Our examination of the legislative history of § 2518(5) supports the conclusion that the *requirement of inserting language* regarding minimization and execution as soon as practicable does not play a central role in the statutory scheme to limit and control electronic surveillance and that it does not "directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano, supra,* 416 U.S. at 527, 94 S.Ct.

at 1832. On this point, we note that while *Giordano* invalidated an order authorizing wire interception, it did so because the very genesis of the proceeding was defective. As the majority recognized, Congress adopted the authorization requirement of § 2516 to ensure that law enforcement agencies did not seek Title III court orders until a high level, politically accountable official had made a personal determination that electronic intrusions were justified in the circumstances of each case. In the case at bar, however, we are not dealing with a question of authorization of the application for a wiretap, a matter which the *Giordano* Court recognized as playing a central role in guarding against unwarranted use of electronic surveillance. What we are dealing with is more factually similar to the type of situation presented in *Chavez.* In *Chavez,* as in this case, there was *actual* compliance with the statute. The technical defect of an omission of the language prescribed by § 2518(5), like that of a misidentification of the officer authorizing a wiretap application, is not sufficient to render the interception of these communications "unlawful" and to warrant suppression under § 2518(10)(a)(i).

38. Rule 12(b)(4) of the Federal Rules of Criminal Procedure explicitly permits the resolution of collateral issues on the basis of affidavits.

39. At the time of the authorization, Peterson was Acting Assistant Attorney General. Defendants asserted, and the Court agreed, that an acting assistant attorney general cannot be designated specially under § 2516 (1) to authorize wiretaps.

40. Henry Petersen also submitted an affidavit which stated that, although he had reviewed the supporting papers, Mitchell had in fact given approval in each case; Petersen's signature was affixed only after Mitchell's approval of each application.

the facial insufficiency in that case was an insubstantial violation of the Act, it did not warrant suppression under § 2518(10)(a)(ii). Accordingly, the case was remanded for consideration of other grounds for suppression not yet reached by the District Court.

In discussing the applicability of the decisions in *Giordano* and *Chavez* to the *Acon* case, Judge Hunter stated:

> *Giordano* and *Chavez* recognize that suppression under (10)(a)(i) is not required for every technical violation. Only "where there is a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures," *Giordano*, 416 U.S. at 527, 94 S.Ct. [1820] at 1832, is suppression required under § 2518(10)(a)(i). Defendant-appellees argue that § 2518(10)(a)(ii), in contrast, applies irrespective of whether substantial limitations of the Act are violated.
>
> In support of this point, they cite language from *Giordano*: "Paragraph (ii) and (iii) [of § 2518(10)(a)] must be deemed to provide suppression for failure to observe some statutory requirements that would not render interception unlawful under paragraph (i)." 416 U.S. at 527, 94 S.Ct. [1820] at 1832. This language does imply that paragraphs (ii) and (iii) must reach violations of some provisions of Title III which do not directly and substantially implement the congressional intent to limit use of wiretaps. Despite this intention to extend (10)(a)(ii) further than (10)(a)(i), we do not conclude that suppression is required for every minor facial insufficiency.
>
> \* \* \* \* \* \*
>
> In Giordano and Chavez, the Supreme Court examined affidavits which varied the submitted identification information. Clearly, an ag-

grieved party may impeach the information submitted by the government to the approving court. In *Giordano,* this occurred. In *Chavez,* however, the government was allowed to vary the identification information after it had been shown by the party attacking the wiretap that the signatory had not in fact given approval. The government was then allowed to show that a proper party, then Attorney General Mitchell, had approved the wiretap. *That the government was allowed to vary the identification submitted to the approving court, supports our conclusion that this requirement is less important than others. The government certainly would not be allowed to amplify the facts presented on the face of the affidavit to the district court in order to improve the district court's finding of probable cause, United States v. Ceraso, 467 F.2d 647, 653 (3d Cir., 1973).*

513 F.2d at 517–518 (emphasis added)

Perceiving, therefore, a distinction between information which the Government may vary by subsequent affidavit and information which must stand on the four corners of the affidavit, the Court concluded that:

> [S]uppression is not required for facial insufficiency relating to less critical requirements which may be varied by subsequent affidavits.

513 F.2d at 518.

Judge Hunter found support for the position that "(10)(a)(ii) suppression is not required for every minor insufficiency", 513 F.2d at 518, in *United States v. Cirillo, supra.* Judge Hunter noted that in *Cirillo* the Court accepted affidavits on the subject of minimization from officers who executed the interception, despite the absence of a minimization provision in the interception order and that, on the basis of those affidavits, the *Cirillo* Court held that suppression was not required.[41]

> 15. We do not necessarily support the Second Circuit's view that failure to include a minimization order is a minor facial insufficiency. We cite the case for the proposition that there can be facial insuf-

41. It is important to point out, however, that while the Court in *Acon* did cite *Cirillo* with approval, it specifically left open the question posed by the present case. Thus, in footnote 15 of the Court's opinion, it was stated:

It is thus plain that the view that every deficiency warrants suppression under 18 U.S.C. § 2518(10)(a)(ii) cannot prevail. The question before us then is whether the absence of the minimization and "execution as soon as practicable" language is of such magnitude as to prevent "variance" by affidavit and testimony and, therefore, to require suppression. We do not believe that it is. Indeed, we believe that the facial insufficiency in this case must be deemed to be technical, hence variable by affidavit, for three reasons.

The first basis for our conclusion that the defect must be deemed technical results from our view that a "substantial compliance" test is applicable under the circumstances (*Acon* so holds, as does *Cirillo*) and from our finding of substantial compliance with the statute in this case. Though in *Cirillo* the record was augmented by affidavit only, here we have done more than merely to accept affidavits. We have held a full dress hearing on the subject. As the result of that hearing we have found: (1) that the DEA agents conducting the wire interception which we authorized were fully instructed, even prior to the entry of our order, as to the "execution as soon as practicable" requirement and the minimization requirement; [42] (2) that the monitoring agents executed as soon as practicable; (3) that by virtue of the foregoing instructions and a large minimization chart at the listening post, the monitoring agents were aware of the minimization requirement throughout the interception period; (4) that the procedures adopted were effective; (5) that the agents made a good faith effort to minimize; and (6) that they successfully minimized. We believe that these findings render the deficiency "cured". Certainly, they demonstrate substantial compliance with the statute.

Our second basis for believing that the defect was of a technical nature stems from the existence of calipers for measurement of the possible existence of prejudice to the defendants. The actuality of minimization and execution as soon as practicable, as well as the awareness of the need to effect these matters, are facts which are particularly susceptible of a showing of prejudice vel non by way of testimony or affidavits. In *United States v. Donovan*, 513 F.2d 337 (6th Cir. 1975), the Court posited such a distinction, which we find to be useful to our analysis here. Although that case involved a failure to serve inventory notice and was decided under § 2518(10)(a)(i), Chief Judge Phillips noted that the role of actual prejudice was inapplicable where the factors involved were not susceptible of a showing of prejudice. It was the Court's finding in *Donovan* that the failure to serve inventory notice, like the failure to authorize properly in *Giordano*, was not susceptible of a showing of prejudice.[43] As noted, that is not the case here. The curative effect of a finding of nonprejudice is the touchstone of the holding in *Cirillo*, which we believe to be sound law. The factual findings recited above in this case not only support a finding of substantial compliance with the statute, but also demonstrate the absence of prejudice to the defendants by reason of the omission from the order of the language requiring minimization.

The third basis for our conclusion is that here, as in *Acon*, we find that only the "less crucial" requirements of the statute were actually breached. This finding stems from our examination of Title III in its entirety and our conclusion that the minimization directives provided for by § 2518(5) are, for the most part, the functional equivalent of further directives which we specified in our order and which are mandated for

---

ficiency which is technical, and, therefore, insufficient to require suppression. 513 F.2d at 519, n. 15.

42. In addition, we note again that the agents were all aware of these requirements due to previous wire interception experience.

43. Accordingly, the *Donovan* Court affirmed the decision of the District Court which had determined that the relevant communications were "unlawfully intercepted" within the meaning of § 2518(10)(a)(i) as delineated by the Court in *Giordano*.

inclusion by § 2518(4).[44] That section provides:

(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

(a) the identity of the person, if known, whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

The provisions of § 2518(4)(c) and (e) comprise significant direction to law enforcement officials as to how reasonable interception will be minimized. We underscore that what we find to be "less crucial" is not the requirement of minimization itself, but the requirement that a § 2518(5) interception directive be inserted, *in haec verba*, in the wire interception order. That the requirement of inserting minimization language and language governing execution as soon as practicable has great prophylactic value cannot be gainsaid. However, it is our duty to give effect to a constitutional statute by the use of common sense. We believe that when the basic guidelines have been laid down for the law enforcement officers by reason of inclusion of the § 2518(4) language in the order, and where there exists a means of measuring compliance with the minimization provisions of the statute (i. e. affidavits and testimony), it cannot be said that the failure to include minimization language is fatal. Moreover, we believe that *Acon* supports this view, for it seems to us that the provision at issue here is a "less crucial" one than that of identification of the authorizing officer which was involved in *Acon*.[45]

In sum, we believe that, under the circumstances of this case, common sense requires us to hold that an inadvertent[46] omission of the relevant language from the order does not constitute a fatal defect where the statute provides calipers for measurement of the impact of the prejudice to the defendants by reason of the omission, where the statute was, in fact, substantially complied with and there was no prejudice to the defendants, and where only the "less crucial" requirements of the statute were actually breached. Put differently, we believe that there was no greater invasion of privacy in this case than was justified by probable cause. Accordingly, the defendants' motions to suppress were properly denied.

They believed that the central purpose of the authorization requirement would be defeated unless the identity of the responsible authorizing officer were fixed in the original application and order.

44. *Accord, People v. Solomon*, 74 Misc.2d 926, 346 N.Y.S.2d 938 (1973).

45. This is so because some evidence exists that Congress regarded the accurate identification of the authorizing officer in the first instance to be a major safeguard within the framework of the statute. Thus, although the majority in *Chavez* rejected the contention that Congress intended the identification requirements by themselves "to occupy a central, or even functional, role in guarding against unwarranted use of electronic surveillance," 416 U.S. at 578, 94 S.Ct. at 1857, the four dissenting Justices reached an opposite conclusion. In their view, Congress enacted the identification requirements as "a significant deterrent to reckless or needless electronic surveillance." 416 U.S. at 594, 94 S.Ct. at 1865 (opinion of Douglas, J.).

46. We note that a question of the good faith of the Government is not at issue in this case. For this reason, *United States v. Eastman*, 465 F.2d 1057 (3d Cir. 1972), is not apposite. In *Eastman*, the Court of Appeals held that where the defendant whose telephone was tapped did not receive notice thereof or an inventory as required by Title III, not because of delay, but as a result of a judicial act which on its face deliberately flouted and denigrated the statutory provisions, the communications were unlawfully intercepted and not admissible into evidence.